**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JERALD TIMES,<br><br>                              Plaintiff,<br><br>            v.<br><br>SUCCESS ACADEMY CHARTER SCHOOLS, INC., HEATHER HALEY, MATTHEW MORALES, and LAMAE DEJONGH, Sued in their Individual and Official Capacities,<br><br>                              Defendants. | **COMPLAINT**<br>**WITH JURY DEMAND**<br><br>Civil Action No.: |

Plaintiff, JERALD TIMES, by and through his attorneys, the law office of AVALLONE & BELLISTRI, LLP, complaining of Defendants, alleges as follows:

1.      This action is hereby commenced for the purpose of seeking to secure protection of, and to redress the deprivation of, rights secured and protected by the United States Constitution, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983, and New York State Executive Law §§ 296, et seq., providing for relief from the above-captioned Defendants' unlawful employment practices of engaging in discrimination based upon Plaintiff JERALD TIMES's race and for retaliation against Plaintiff JERALD TIMES for engaging in the protected activity of formally complaining of said discrimination, and the creation of a hostile work environment which Plaintiff was forced to endure.

2.      Additionally, this claim seeks money damages, both accrued and prospective, on behalf of Plaintiff JERALD TIMES and attorney's fees pursuant to 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

3.      The jurisdiction of this Court is invoked based upon federal question and pursuant to the Constitution of the United States, the New York State Constitution, 28 U.S.C. §§ 1343(3) and (4), 28 U.S.C. § 1331, as well as 42 U.S.C. § 2000e through § 2000e(15).

4.      This Court has supplemental jurisdiction over the claims pursuant to 28 U.S.C. § 1367 because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Jurisdiction is also invoked under the doctrine of pendant jurisdiction with respect to any and all state claims set forth in all counts.

6.      The rights, privileges and immunities sought herein to be redressed are those secured by the freedom of speech clause of the First Amendment and by the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution, as well as provisions against discrimination on the basis of race, retaliation in employment and the creation of a hostile work environment, based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983, along with applicable provisions of the New York State Constitution and the New York State Executive Law.

7.   Venue is proper within the Southern District of this Honorable Court, Manhattan, State of New York, pursuant to 28 U.S.C. § 1391, as a substantial part of the defendants' discriminatory and retaliatory conduct took place in New York County, the corporate Defendant's principal place of business and the individual Defendants' actual place of business is within the judicial district, and the causes of action include violations of the New York State Constitution and the New York State Executive Law.

## SATISFACTION OF PREREQUISITES UNDER TITLE VII

8.   On January 26, 2021, Plaintiff JERALD TIMES, in accordance with applicable law, filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"). Plaintiff's verified complaint was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC"), an organization which receives and investigates charges of discrimination as set forth by the Federal Anti-Discrimination Laws, including Title VII of the Civil Rights Act, as amended, and was assigned Federal Charge No. 16G-2021-01145.

9.   Said verified complaint charged Defendant SUCCESS ACADEMY CHARTER SCHOOLS, INC., with engaging in unlawful employment discrimination practices based upon race, retaliating against Plaintiff JERALD TIMES for engaging in protected activity, and creating a hostile work environment.

10.     On January 25, 2023, the EEOC issued a "Right to Sue" Letter advising Plaintiff JERALD TIMES of the completion of his prerequisites to file suit in federal court. Plaintiff received said "Right to Sue" Letter on January 25, 2023. A copy of the "Right to Sue" Letter is annexed hereto (**Exhibit "A"**).

## PARTIES

11.     Plaintiff JERALD TIMES (hereinafter, "TIMES") is an African American man.  Plaintiff TIMES is over twenty-one (21) years of age and a resident of New York County, New York.  As such, Plaintiff is a member of a protected class.

12.     Plaintiff TIMES was an employee of Defendant SUCCESS ACADEMY CHARTER SCHOOLS, INC., as the Director of Chess Program.

13.    Defendant SUCCESS ACADEMY CHARTER SCHOOLS, INC. (hereinafter, "SUCCESS ACADEMY") operates a charter school network in Manhattan, the Bronx, Queens and Brooklyn, New York.

14.    At all times hereinafter mentioned Defendant SUCCESS ACADEMY was and is a not-for-profit corporation organized and existing under and by virtue of the laws of the State of Delaware.

15.    At all times hereinafter mentioned Defendant SUCCESS ACADEMY was and is a not-for-profit corporation organized and existing under and by virtue of the laws of the State of New York.

16.    At all times hereinafter mentioned Defendant SUCCESS ACADEMY was and is a foreign corporation organized and existing under and by virtue of the laws of the State of New York.

17.    At all times hereinafter mentioned Defendant SUCCESS ACADEMY was and is a foreign corporation organized and existing under and by virtue of the laws of the State of New York.

18.    At all times hereinafter mentioned Defendant SUCCESS ACADEMY was and is an authorized foreign corporation doing business in the State of New York.

19.    At all times hereinafter mentioned Defendant SUCCESS ACADEMY was and is an unauthorized foreign corporation doing business in the State of New York.

20.    Defendant SUCCESS ACADEMY maintains its principal place of business at 95 Pine Street, Floor 6, New York, NY 10005.

21.    Defendant SUCCESS ACADEMY is an employer within the definitions contained in 42 U.S.C. § 2000-E, employing more than fifteen (15) employees, and is

engaged in an industry affecting commerce.

22.     At all times hereinafter mentioned Defendant SUCCESS ACADEMY was Plaintiff TIMES's employer.

23.     Defendant HEATHER HALEY (hereinafter, "HALEY") at all times relevant to this Complaint, was an employee of Defendant SUCCESS ACADEMY, employed as the Managing Director of Experiential Learning, was at all times relevant Plaintiff's supervisor, and is sued in her individual and official capacities.

24.     Defendant MATTHEW MORALES (hereinafter, "MORALES") at all times relevant to this Complaint, was an employee of Defendant SUCCESS ACADEMY, employed as a Chess Manager, and is sued in his individual and official capacities.

25.     Defendant LAMAE DEJONGH (hereinafter, "DEJONGH") at all times relevant to this Complaint, was an employee of Defendant SUCCESS ACADEMY, employed as a Chief Schooling Officer, was at all times relevant Plaintiff's supervisor, and is sued in his individual and official capacities.

## NATURE OF ACTION

26.     This is an action for declaratory relief and damages to secure protection of, and to redress the deprivation of, rights secured by the United States Constitution and the New York State Constitution.  This action seeks relief for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983, and New York State Executive Law §§ 296, et seq.  These statutes provide for relief against discrimination in employment and seek to correct unlawful employment practices such as those undertaken by the herein Defendants.  The unlawful actions of Defendants were based upon Plaintiff TIMES's race, and in retaliation for

Plaintiff TIMES's formal and informal complaints of discrimination and harassment, and Plaintiff TIMES being mentioned and named as a witness in a co-worker's EEOC complaint against Defendant SUCCESS ACADEMY.  Additionally, Defendants created a hostile work environment that Plaintiff TIMES was forced to endure.  Defendants allowed said hostile environment to continue unabated and failed to remove or cease creating these hostile conditions or stop the retaliation from continuing.  Because of Defendants' unlawful actions, Plaintiff TIMES was unlawfully terminated from his employment with SUCCESS ACADEMY.

27.     Additionally, this claim seeks monetary damages, both accrued and prospective, on behalf of Plaintiff TIMES, and attorney's fees pursuant to 42 U.S.C. § 1988.

## **RELEVANT FACTS**

28.     Plaintiff JERALD TIMES is an African American male.  As such, he is a member of a protected class.

29.     Plaintiff TIMES has been active in his opposition to discriminatory practices, having documented his personal charges of employment discrimination with the SUCCESS ACADEMY Human Resource Department and the EEOC.

30.  Plaintiff TIMES was subjected to discriminatory animus harbored toward him on the basis of his race by Defendants HALEY, MORALES and DEJONGH during Plaintiff's employment at Defendant SUCCESS ACADEMY.

31.  Moreover, Plaintiff TIMES was subjected to retaliatory animus harbored toward him on the basis of his complaints of discrimination by Defendants HALEY, MORALES and DEJONGH during Plaintiff's employment at Defendant SUCCESS ACADEMY.

32.     Plaintiff TIMES was first interviewed for the position of Chess Manager with SUCCESS ACADEMY in November 2018 with Defendant DEJONGH.

33.     Defendant DEJONGH recruited Plaintiff TIMES to work at SUCCESS ACADEMY after TIMES was a chess coach for one of DEJONGH's children.

34.     On or about December 10, 2019, TIMES was again interviewed for employment at SUCCESS ACADEMY, this time with CEO Eva Moskowitz.

35.     On or about January 28, 2019, Defendant SUCCESS ACADEMY hired Plaintiff TIMES as Director of Chess Program, which is a position above Chess Manager, for which Plaintiff had interviewed.  As Director of Chess Program, a/k/a Chess Director, Plaintiff TIMES was part of the Scholar Talent Team and worked throughout SUCCESS ACADEMY's schools and in SUCCESS ACADEMY's Network Office located at 95 Pine St, New York, NY 10005.

36.     Upon his hiring, Plaintiff TIMES became the first Director of Chess Program, a/k/a Chess Director, for SUCCESS ACADEMY.  The former lead position was Chess Manager, held by Sean O'Hanlon (Caucasian), before the Director position was introduced.  Plaintiff TIMES was the sole African-American Director on the Scholar Talent team, which included three (3) other Directors.

37.     Upon information and belief, in or about February 2020, a top teacher lead position (a/k/a "Labsite" position) became available, and an all-white selection committee, appointed by SUCCESS ACADEMY, began the process to review candidates.  The following individuals were considered and reviewed for the Labsite position: Christopher Johnson (African American); Dakim Vanterpool (African American); Alexander Beltre (Afro-Latino); Robert Leonard (White); Alejandro Montalvo (Latino); and Asandoh Jones (African

American).  Of the six applicants, the selection committee chose the only White applicant for the lead position, despite the other five applicants being more qualified.

38.  As part of Defendant SUCCESS ACADEMY's process to appoint White individuals to top teacher lead positions over non-White individuals, three (3) persons of color, who all held Labsite positions, were demoted from their Labsite positions: Christopher Johnson (African American); Dakim Vanterpool (African American); Alexander Beltre (Afro-Latino).

39.  Plaintiff TIMES, who was only recently hired by Defendant SUCCESS ACADEMY, was put in the difficult position of having to assign said demoted individuals, all people of color, the second lead position, which afforded them less status and salary than they had before.

40.  Upon information and belief, no senior leaders who observed applicants as part of the promotion process were people of color.  Two of the demoted individuals, Dakim Vanderpool (African American) and Christopher Johnson (African American), eventually chose to resign from SUCCESS ACADEMY as a result of their demotions, which had a demoralizing effect on the chess program.

41.  In the twenty-one months and two weeks that Plaintiff TIMES was Director of Chess Program, there were no internal chess competitions held in communities of color, even though 83% of Defendant SUCCESS ACADEMY's students are students of color.  Plaintiff complained about this disparity, but Defendant MORALES instead placed the Network Chess Club in Cobble Hill, Brooklyn (76% white neighborhood), and placed internal competitions in the Upper West Side, Manhattan (70% white neighborhood).  Plaintiff explained that the ongoing avoidance and refusal to hold events in communities of color

negatively impacts most of Defendant SUCCESS ACADEMY's students.

42. As a result of Plaintiff's criticism regarding the locations for chess tournaments, Defendant HALEY promised that SUCCESS ACADEMY would start to hold tournaments in communities of color, but never did, even though SUCCESS ACADEMY held tournaments in white communities including Cobble Hill and Upper West Side during Plaintiff TIMES's tenure.

43. Upon information and belief, African American chess coaches routinely received lower evaluations from the evaluator, Defendant MORALES, than white coaches, even though Plaintiff, as a Director, observed that the African American coaches were performing their jobs well, if not better, than their Caucasian/white co-workers.

44. Moreover, Defendant MORALES was against promoting qualified African Americans, such as Tyrell Harriott and Asandoh Jones. Morales showed racial animus in his harassment of Tyrell Harriott, in his being involved in an incident involving an unauthorized picture of Giovanni Merritt (African American), and in his consistent undermining of the Director of Chess Program, Plaintiff TIMES.

45. Moreover, Defendant MORALES was opposed to SUCCESS ACADEMY hiring Kasaun Henry (African American) despite his outstanding qualifications (possessing 3 Master's degrees and rated in the top 3% of chess players in the country). As a result of MORALES's opposition, SUCCESS ACADEMY rejected Kasaun Henry's application.

46. Defendant MORALES was not qualified for his position in that he lacked a college degree.

47. Upon information and belief, Defendant MORALES routinely did not write his own emails and instead depended on others to compose his emails for him because he lacked

proficiency.

48. MORALES was further not proficient at and unable to develop KPIs or write a curriculum, which Plaintiff TIMES did during his tenure at SUCCESS ACADEMY.

49. Further, MORALES had a limited understanding of interpreting the Qualities of an Excellent Teaching ("QET") and the Qualities of an Excellent Classroom ("QEC") rubrics utilized by SUCCESS ACADEMY. These rubrics were integral to evaluating teacher performance and recommending qualified candidates for promotions, and as a result, MORALES was not proficient in this role.

50. In 2019, Defendant MORALES put Defendant SUCCESS ACADEMY's chess program over budget. MORALES lacked a track record of building championship chess teams, he had noteworthy accomplishments with the chess program, and he received no positive press for his chess acumen or success in developing chess programs, like Plaintiff TIMES, who was the subject of numerous such articles, for example, in the New York Times and on Chessbase.com. Further, MORALES had a poorer understanding of competitive chess metrics compared to Plaintiff TIMES.

51. Defendant SUCCESS ACADEMY expects all of its teachers to be "whole school" teachers and not just teach their content area. This includes grading tests and other academic training, where Defendant MORALES's lack of a college degree led to a deficiency in his performance. In his role, MORALES was tasked with training chess teachers whose educational acumen was higher than his and whose chess ranking was significantly higher than MORALES's. As such, it was difficult for MORALES to effectively teach those who possessed more education, experience, and abilities. This also made it difficult for MORALES to properly hire, evaluate and train coaches, but Defendant HALEY continued to

have him do so despite his poor performance and lack of qualifications.

52. As a result of Defendant MORALES's deficiencies, between August and December 2019, the chess program lost twelve (12) teachers, at least ten (10) of which were under MORALES's supervision.  This affected both morale and the development of teachers.

53. Defendant SUCCESS ACADEMY organizes the chess program at the elementary school level, "Elementary Network Chess Club"," in which ten (10) elementary schools report to a central hub.  Defendant MORALES placed this hub in a majority white community (Cobble Hill) with an underrepresentation of the minority students from SUCCESS ACADEMY, thus causing great inconvenience for the approximately 83% of its students, and their parents, who are students of color.  Defendants resisted and failed to hold chess events in communities of color, which also had subway stations for access for students, and would be more convenient for many of SUCCESS ACADEMY students, many of whom live in these communities.

54. In fact, Defendant MORALES chose to place the Network Chess Program in Cobble Hill in the midst of the protests in the wake of the George Floyd murder and at or about the same time that Defendant SUCCESS ACADEMY introduced new Diversity, Equity and Inclusion ("DEI") policies to address systemic racism.  Accordingly, MORALES's decision not to place the Network Chess Program in a more diverse community during this time was intended and seen as being anti-inclusive and further marginalized students and staff of SUCCESS ACADEMY who are black and brown, including Plaintiff TIMES.

55. Notably, in regard to the introduction of DEI policies, SUCCESS ACADEMY ultimately rejected the idea of hiring a Chief Diversity Officer ("CDO"), further condoning the discriminatory practices occurring at SUCCESS ACADEMY, and more specifically

those directed at Plaintiff TIMES.

56. Additionally, in or about February 2019, Defendant MORALES removed tournaments affiliated with the United States Chess Federation ("USCF") from the chess program.  USCF-affiliated tournaments enabled student participation in their own school buildings without having to pay entry fees.  The removal of affiliated tournaments made students, and in particular students from less affluent backgrounds, play in fewer tournaments.

57. Using affiliated tournaments is considered a necessity for competitive chess programs because it allows students, regardless of ability to travel and pay, to play in more rated games and properly develop as chess players.  As a result, MORALES's decision negatively impacted all students in that it made it more difficult for all students to get experience playing in competitive tournaments and increase their rankings, and the effect was most profound on students with more limited travel capabilities and resources.

58. In March 2019 and in 2020, both African American chess instructors were denied promotions by Defendant MORALES.  Tyrell Harriott, (African American) was denied promotion in 2019, and Asandoh Jones, (African American) was denied promotion in 2020.  During the same time period, their Caucasian/white colleagues, Gregory Keener, Alexander Fikiet, Robert Leonard, and Liam Murphy, received promotions.  Defendant SUCCESS ACADEMY used different and more stringent promotion criteria for chess coaches of color than it was using for white employees, making it much more difficult for African American coaches to be promoted, even when their work was comparable or superior to that of Caucasian/white instructors.

59. Plaintiff TIMES raised this issue arid the fact that implicit bias may be playing a role with teacher evaluations and promotions.

60. Defendants SUCCESS ACADEMY admitted that implicit bias played a role by subjecting SUCCESS ACADEMY employees to unconscious bias training. However; this training had no impact on the discrimination at SUCCESS ACADEMY.

61. In or about September 2019, Plaintiff TIMES, pursuant to his role as Director of Chess Program, developed and introduced the first Key Performance Indicator ("KPI") system to evaluate performance in SUCCESS ACADEMY's chess program. The KPIs introduced specific, measurable, and objective performance metrics to track the progress of the chess program over time, which did not exist before. This allowed TIMES, and other chess teachers and administrators, to collect and measure data, typically organized on spreadsheets, and analyze aspects of the chess program according to objective criteria, as opposed to anecdotal evidence.

62. For example, as part of Plaintiff TIMES's KPI system, TIMES conducted a well-organized study of the gender ratios so SUCCESS ACADEMY could improve the retention rate of girls in chess; TIMES calculated costs per child for chess tournaments; TIMES tracked students' average chess ratings as well the number of competitive chess games played in their schools; TIMES calculated the average number of rated games played in SUCCESS ACADEMY's elementary and middle schools; TIMES compared SUCCESS ACADEMY championship averages with national averages; and TIMES tracked competitive placements in city, state, and national championships for SUCCESS ACADEMY elementary and middle school students.

63. TIMES's data identified achievement gaps and provided a basis for policies that could be developed to address areas of improvement and the identifiable, measurable needs of SUCCESS ACADEMY's chess program.  For instance, by using the KPIs, TIMES identified that more affluent neighborhoods had higher chess ratings and that family income and access to a top-performing chess coach are two determining factors of a scholar's success in chess.

64. In or about October 2019, internal chess competitions were held in Cobble Hill, an approximately seventy-six percent (76%) white neighborhood, and Upper Westside, an approximately seventy percent (70%) white neighborhood.

65. On or about October 21, 2019, Plaintiff complained to Defendant HALEY and Natalie Allen, Defendant SUCCESS ACADEMY's Human Resources Associate, that Defendant MORALES was targeting and bullying African American chess coaches, specifically: (1) MORALES preventing promotion of highly qualified African American chess coaches, Tyrell Harriott and Asandoh Jones, while promoting white chess coaches; and (2) MORALES using the picture of an African-American chess teacher, Giovanni Meritt, to make it appear that Meritt was not properly performing his job.

66. On or about November 14, 2019, in retaliation for Plaintiff's complaints of discrimination, Defendants HALEY and DEJONGH removed part of the chess program from Plaintiff's responsibility — overseeing internal competitions — and gave the responsibilities to Defendant MORALES, without explanation. Moreover, Defendant HALEY and/or Defendant DEJONGH appointed Defendant MORALES to SUCCESS ACADEMY's "Engagement Committee," further enhancing his status within SUCCESS ACADEMY, despite not being qualified for the position compared to Plaintiff TIMES and despite Plaintiff's complaints about MORALES to the Human Resources department.

67. Not only did Defendant SUCCESS ACADEMY refuse and fail to take any disciplinary action against Defendant MORALES, but Defendants also condoned the discriminatory and retaliatory conduct against TIMES in that Defendants HALEY and DEJONGH appointed Defendant MORALES to the Engagement Committee and not TIMES.

68. During the 2018-19 schoolyear, Plaintiff TIMES had to write all T-school courses had to compose PowerPoint presentations for the Network Chess Program.  In the 2018-19 schoolyear, Defendant MORALES was out on paternity leave, and in the 2019-20 schoolyear, MORALES was out with Covid-19.

69. During the 2019-2020 schoolyear, Plaintiff had to take on significantly more work because Defendant MORALES took significant time off (after and in addition to paternity leave), going on additional (sick) leave.  As a result of Defendant MORALES's absence, Plaintiff had to create a chess program curriculum on his own, including having to write approximately 25 training courses for the chess teachers, by himself.  As a result of the increased responsibilities, Plaintiff TIMES had to cancel a scheduled trip to Philadelphia.

70. Defendant MORALES did not have the credentials to write the chess curriculum.  In MORALES's absence, TIMES had to write the entire chess curriculum, as well as training courses for the "T-school" (used for training teachers), and had to author numerous PowerPoint presentations.

71. Defendant Morales has a high school diploma and has not earned any higher educational degree.  Plaintiff TIMES has not only a high school diploma but also a Bachelor of Arts in Liberal Arts (Major in English); in addition to having been recognized as a Chess Master by the United States Chess Federation, TIMES is two time Harlem Chess Champion, and he was formerly ranked top sixth Black chess player in the world.  TIMES is also a

former commentator on PBS and has been featured in the New York Times in several articles. TIMES taught chess in the townships of South Africa for three years, and he became the first American to coach an African chess team in the All-African Games in 2011. He is also the first African American to win Chess Educator and has won over nine national championships.

72. In addition, Defendant SUCCESS ACADEMY used and was benefitted by Plaintiff TIMES's name, image and likeness in that SUCCESS ACADEMY used a New York Times article about TIMES to recruit chess teachers for the program; SUCCESS ACADEMY benefitted from TIMES's prestige in chess by promoting him as their director in the Mission Possible article on SUCCESS ACADEMY's website; CEO Eva Moskowitz posted his ChessBase article on LinkedIn and on Twitter; Eva Moskowitz tweeted about Jerald Times; and TIMES spoke on the death of chess teacher Charu Robinson and was quoted in a New York Times interview.

73. Despite Plaintiff TIMES's superior efforts, qualifications, and accomplishments, Defendant HALEY rated MORALES higher than Plaintiff in evaluations.

74. In or around December 2019, Jones Murphy, an African-American with a PhD in physics, was invited by Plaintiff TIMES to apply to speak at one of SUCCESS ACADEMY's online tournaments, which included players from SUCCESS ACADEMY and South Africa. Jones Murphy was not charging a fee for his speaking appearance. Defendant SUCCESS ACADEMY instructed the human resources department to force Dr. Murphy to undergo an extensive and abnormally intrusive application process. Murphy, in addition to being fingerprinted, was subjected to a background investigation including criminal history; litigation history; motor vehicle record and accident history; social security number

verification; address and alias history; credit history; verification of education, employment and earnings history; professional licensing, credential and certification check; drug/alcohol testing results and history; military service; and other information.

75. White invitees to guest speak, such as Michael Klein and Alexey Root, also invited by Plaintiff TIMES, were not required to undergo such a stringent background check and produce such documents.  Upon information and belief, only one of the Caucasian speakers was fingerprinted, while the other was not, and they both were just required to submit their education and employment histories, but were not subjected to the same invasive background search.

76. Plaintiff, as Director of Chess Program, provided Natalie Allen, Defendant SUCCESS ACADEMY's Human Resources Associate, with his observations that Defendant MORALES discriminated against Tyrell Harriott, an African American chess teacher employed by Defendant SUCCESS ACADEMY, including MORALES's refusal to promote Harriott despite his qualifications.  Additionally, Plaintiff provided Allen with other instances of MORALES engaging in discrimination, including the Merritt situation.

77. In or about April 2020, in response to Mr. Harriott's complaint (African American part-time chess teacher), Defendants attempted to transfer Mr. Harriott to a location much farther from his home and attempted to force him to work a full-time schedule, when he was hired as a part-time chess teacher and could not work a full-time schedule, and Defendants were aware he could not work full-time.

78. On or about May 13, 2020, Plaintiff contacted Natalie Allen, Defendant SUCCESS ACADEMY's Human Resources Associate, about the discriminatory and retaliatory nature of Defendants' attempts to transfer Mr. Harriott.  Plaintiff requested a meeting about the

transfer.   Allen responded that she wanted to schedule a meeting among Mr. Harriott, Plaintiff TIMES, and Defendant HALEY to further discuss this issue.  However, before a meeting could be scheduled, HALEY told Plaintiff that the decision to transfer Mr. Harriott was already made and was final.

79. On or about May 16, 2020, Eva Moskowitz, CEO of SUCCESS ACADEMY, published the following tweet:

> Yet another challenge we've encountered since going remote is
> ensuring our kids can still access experiential subjects like chess
> that are integral to our core curriculum. Our Chess Director,
> Jerald Times, has not skipped a beat in developing a new model.

Said tweet also contained a link to an article on Chessbase.com describing Plaintiff TIMES's holistic approach to chess programs and developing digital aspects of the chess curriculum during the pandemic.

80. Plaintiff TIMES was not given notice or consulted with by anyone at SUCCESS ACADEMY involved in the decision to remove Tyrell Harriott by transferring him to another school before said decision was made, even though Plaintiff was Director of Chess Program and Mr. Harriott's supervisor.  It was only after the transfer was decided that Plaintiff TIMES was asked for additional locations where Mr. Harriott to be placed.

81. Despite all previous transfers requiring approval from the Director of Chess Program, Defendant SUCCESS ACADEMY did not seek or receive Plaintiff's approval for Mr. Harriott's proposed transfer.

82. Defendants HALEY and DEJONG, in further retaliation for Plaintiff TIMES's complaints of discrimination, completely removed, sidelined and marginalized TIMES, the Director of Chess Program, from the decision to transfer Tyrell Harriott.

83. On or about June 12, 2020, Tyrell Harriott filed a claim of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in which he named Plaintiff JERALD TIMES as a witness and Defendant SUCCESS ACADEMY as the respondent.  At the time, Plaintiff JERALD TIMES was not aware that he had been listed as a witness in the EEOC complaint.  As a result of being mentioned as a witness for Mr. Harriott, Plaintiff was further targeted, harassed and retaliated against.

84. On or about June 18-19, 2020, in the aftermath of Tyrell Harriott's removal by Defendant SUCCESS ACADEMY, Bedford-Stuyvesant Middle School parents began to complain about Tyrell Harriott's dismissal.  The parents' complaints voicing disapproval of Tyrell Harriott's dismissal were emailed to CEO Eva Moskowitz, Defendant HALEY, and Plaintiff.

85. Tyrell Harriott was seen and appreciated by his colleagues, students, their parents, and the chess community at large as an invaluable asset to chess education.  Harriott is a black chess master (a statistical rarity) who taught in a "Title One" school, meaning there is a sizable representation of minority students as well as students who do not typically have resources to independently access a top-level chess coach.  Harriott also won the Teacher Excellence Award.  The transfer and dismissal of Harriott was both a symbolic and a real and tangible blow to the community Harriott involved himself in, and in particular African American members of that community.

86. Eva Moskowitz, CEO of Defendant SUCCESS ACADEMY, disregarded complaints about the removal of Tyrell Harriott, a popular and highly successful African American chess teacher, and she did not hold a meeting to address the complaints.  However, one year earlier, Ms. Moskowitz held a meeting to address the concerns of the chess parents in a majority

White community at Hudson Yards Middle School, a school operated by SUCCESS ACADEMY.  Moskowitz went to the Hudson Yards Middle School to converse with the parents there who had complaints about allocating chess program resources and proposed changes to the chess program.  No such redress was granted to the parents of Bedford-Stuyvesant Middle School, located in a black community, following the removal of Tyrell Harriott.  This is a further example of the Defendants' pattern and practice of discrimination on the basis of race.

87. As such, Defendants' demotion and eventual termination of Plaintiff TIMES was in retaliation for TIMES's testifying truthfully on behalf of Mr. Harriott and in support of Mr. Harriott's complaints of discrimination, in addition to TIMES's own complaints.

88. On or about June 15, 2020, Defendant HALEY issued an evaluation to Plaintiff giving Plaintiff a two (2) out of a possible four (4) rating.  This evaluation was inconsistent with his performance and did not reflect the growth of the chess program under Plaintiff's direction or the chess curriculum singlehandedly developed by Plaintiff.

89. During his tenure, Plaintiff achieved the following accomplishments: (1) created a national recruitment model which brought in 100 resumes and hired 18 teachers; (2) renegotiated contracts which saved SUCCESS ACADEMY approximately $26,000.00; (3) wrote all the teacher training courses in 2019; (4) originated early introduction to chess by creating K-2 chess clubs; (5) administered the chess program without assistance for a significant part of his tenure at SUCCESS ACADEMY: (6) enhanced professional development by bringing in guest speakers: (7) inaugurated the chess program first Key Performance Indicators (KPIs); (8) singlehandedly wrote the entire K-8 chess curriculum: (9) elevated the competitive metrics by leading SUCCESS ACADEMY to its first  national

championship sanctioned by the United States Chess Federation ("USCF"): (10) procured approximately 3,000 to 4,000 free online memberships to ChessKid in the midst of the pandemic; (11) ushered in positive press with interviews with the New York Times and ChessBase, a world-renowned chess company and newsletter; and (12) designed the remote learning model for the chess program.

90. In fact, just one month prior to Defendant HALEY's inaccurate and retaliatory performance review, on May 16, 2020, Eva Moskowitz, CEO of SUCCESS ACADEMY, sent out a tweet lauding Plaintiff TIMES for having "not skipped a beat" in skillfully developing the chess program during the pandemic and linking to an article written about Plaintiff TIMES's successful and noteworthy chess programs.

91. On June 30, 2020, Plaintiff JERALD TIMES emailed Defendant HALEY about the parental complaints regarding the dismissal of Tyrell Harriott.  In said email, Plaintiff TIMES noted Mr. Harriott's successes as a chess teacher and his positive impact on youth. TIMES also stated that further discussion was needed on how SUCCESS ACADEMY should respond to the parents to address the controversy.

92. Plaintiff TIMES disagreed with Defendant HALEY on how to approach the Bedford-Stuyvesant Middle School parents in response to their complaints about Mr. Harriott being transferred.

93. Defendant HALEY wanted Plaintiff TIMES to email the parents, but Plaintiff told HALEY that an email in this situation was ill-advised and potentially problematic for SUCCESS ACADEMY, and that an in-person meeting would be preferred.

94. As a result of Plaintiff TIMES's email, Defendant HALEY reported him to the Human Resources department for alleged insubordination, which was ultimately found to be

unsubstantiated.

95. As a result of Plaintiff TIMES's email, Defendant HALEY complained to Defendant MORALES that Plaintiff "threw her under the bus."

96. July 6, 2020, Plaintiff met with Defendant DEJONGH for a disciplinary meeting, per Defendant HALEY's directive, for alleged insubordination.

97. The Public Affairs department of Defendant SUCCESS ACADEMY agreed with Plaintiff TIMES that no email should be sent and that this situation should be handled with an in-person meeting with the Bedford-Stuyvesant Middle School parents, as previously suggested by Plaintiff. As a result, no insubordination was found.

98. Still, there was a difference in opinion regarding how to approach the parents of Harriott's former students between Defendant HALEY and Plaintiff TIMES.

99. As a result of Plaintiff TIMES's aforementioned complaints, Defendants increased their retaliation and creation of a hostile work environment.

100. In August 2020, Defendant MORALES was out on sick leave, and Plaintiff TIMES was tasked with administering the chess program by himself. MORALES remained out for approximately three weeks, during which time Plaintiff assumed Defendant MORALES's responsibilities, including preparing a presentation for the elementary school Network Chess Program, which Plaintiff did.

101. In August 2020, Plaintiff TIMES was awarded Chess Educator of the Year by the University of Texas at Dallas. Plaintiff TIMES was the first African American to win the award.

102. On or about August 11, 2020, merely six weeks after Plaintiff complained about the discriminatory conduct to which Defendants subjected Mr. Harriott, Defendant

HALEY informed Plaintiff that she was placing him on a Performance Improvement Plan ("PIP"), even though, as detailed above, Plaintiff had always performed his job in an exemplary fashion and had never received any previous discipline. Notably, in the same month (August 2020), Plaintiff was awarded Chess Educator of the Year and took on Defendant MORALES's job duties while he was out for an extended period of time, which the PIP failed to mention. Similarly situated non-African-American employees and/or those who did not engage in protected activity, were not issued PIPs without a valid basis. That same month, Defendant HALEY began to further undermine Plaintiff's ability to perform his job duties.

103.     For example, on or about August 18, 2020, Plaintiff reached out to Defendant HALEY about establishing qualifications for competitive chess tournaments for students. These metrics would help determine which students would be eligible for local and national championship tournaments. Despite Plaintiff's explanation as to how these qualification metrics would benefit SUCCESS ACADEMY's students, Defendant HALEY initially sided with Defendant MORALES and insisted on using different metrics for these competitive tournaments. As Director of Chess Program, Plaintiff was supposed to be responsible for determining the metrics for students to participate in these tournaments. HALEY and MORALES also repeatedly undermine Plaintiff's ability to perform his duties as the Director, including limiting his ability to promote and transfer qualified teachers. As a result, Defendants further marginalized Plaintiff's position as Director of Chess Program, based on discriminatory and retaliatory animus.

104.     On Or about October 9, 2020, Defendant HALEY advised Complainant that she was demoting him.

105.     In regard to the demotion, Defendant HALEY falsely claimed that Plaintiff's work was not equal to that of other Directors and that he had difficulty managing people. HALEY informed Plaintiff TIMES that he would be demoted to Chess Manager, his salary would be cut, and Plaintiff would have diminished direction and control over the chess program that Plaintiff had developed and successfully managed and expanded, despite Defendants' discriminatory and retaliatory efforts.  Plaintiff's role was so diminished that he could no longer make executive decisions for the program.

106.     Plaintiff TIMES disagreed with Defendant HALEY's performance assessment, and in or about October 2020, TIMES, in response to HALEY's inaccurate performance assessment, sent an email to Human Resources outlining his contribution to the SUCCESS ACADEMY chess program.

107.     Subsequent to Plaintiff's demotion, Defendant HALEY would assume the role of making executive decisions regarding the chess program.  Thereby, Defendant HALEY not only diminished Plaintiff TIMES's role but also, in effect, took it away from him as part of her retaliation against TIMES.

108.     Soon thereafter, Defendant HALEY directed Defendant MORALES to take full ownership of the chess program, despite MORALES being less qualified than Plaintiff TIMES.

109.     Defendant MORALES had never filed a complaint of discrimination and never testified on behalf of a coworker who had filed such complaints of discrimination.

110.     Ultimately, Defendant SUCCESS ACADEMY dismissed a teacher (Tyrell Harriott) who complained about racial discrimination and dismissed the Director of Chess Program (Plaintiff TIMES), who also complained of discrimination and advocated for the

teacher, Mr. Harriott, to follow proper procedures in regard to submitting his complaint of discrimination to the Human Resources Department.

111.     Similarly, non-African-American employees and/or those who did not engage in protected activity, were not demoted absent a valid reason, did not have their salaries cut, and were not stripped of the ability to make executive decisions.

112.     October 12, 2020, Plaintiff TIMES hosted the online Feinberg Awards, at which, Jessica Hyatt, an African American female player, won a $39,000.00 endowment toward her attending college.  TIMES earlier informed the Public Affairs department that Jessica Hyatt could be the first African American female master in history. Hyatt's placement in the chess constellation of possibly being the first ever African American female master was not known by SUCCESS ACADEMY officials.

113.     On or about October 16, 2020, Plaintiff emailed Defendant SUCCESS ACADEMY's CEO, Eva Moskowitz, to request a meeting to appeal his proposed demotion and explain the retaliatory nature of the same.   While Moskowitz previously had told Directors that she wanted to have meetings with them if they ever had any issues, she refused Plaintiff's request for a meeting.   Just a few weeks (approximately 3-5 weeks) prior, Moskowitz granted such a meeting to Director of Sports Program, Boris Bozic (Caucasian).

114.     On or about October 21. 2020, Plaintiff emailed Aparna Ramaswamy (Chief Human Capital Officer) and Robin Trainor (Head of Human Resources) to complain about the discriminatory and retaliatory proposed demotion.

115.     On or about October 29, 2020, Plaintiff met with Defendant HALEY and Robin Trainor (SUCCESS ACADEMY employee in the Human Resources department) via Zoom.  During this meeting, Trainor informed Plaintiff that despite his complaints, they were

demoting him, as discussed previously with Defendant HALEY.   Moreover, during this meeting HALEY complained to Plaintiff that he complained to Moskowitz about his retaliatory demotion.

116.      Defendant SUCCESS ACADEMY's Human Resources Department failed to address this discriminatory and retaliatory demotion of Plaintiff and failed to afford Plaintiff the opportunity to appeal his demotion, as they would have afforded other Directors.

117.      Plaintiff refused to accept Defendants' discriminatory and retaliatory demotion, and as a result, Defendants terminated his employment or about November 17, 2020.

118.      Despite Plaintiff TIMES's continued success and accolades, and the overall success of the chess program, Defendants HALEY and MORALES displayed a consistent theme of exploiting the trope that black and brown employees, including Plaintiff TIMES, were inherently less hardworking, less qualified, and therefore more expendable than white employees on the basis of race.   In particular, HALEY exploited this excuse to justify stripping TIMES of his authority, replace him with MORALES, who was less qualified and less successful than TIMES, and ultimately fire him.

119.      During the 2019-2020 schoolyear, under Defendant HALEY's supervision and at her direction, Defendant SUCCESS ACADEMY furloughed multiple black basketball coaches (the basketball program and their  coaches are also part of the Scholar Talent Team, as is/was the chess program including Plaintiff TIMES as the Chess Director).  The furloughs were not race-neutral and were motivated by discriminatory animus, as Defendant SUCCESS ACADEMY chose to furlough the basketball coaches and not the (predominantly Caucasian/white) soccer coaches.  Said coaches included Ieasia Walker (African American,

furloughed); Gregory Perrin (African American, resigned due to furloughs and denial of promotion); Henry Brooks (African American, furloughed); Marvin McCullough (African American, furloughed); Dorryn Simmons (African American, furloughed); Tony Hackle (African American, furloughed); Louie Lewis (African American, furloughed); Brian Addison (African American, furloughed); Trey Coerbell (African American, furloughed); Leon Arrington (African American, furloughed); Michael Barnes (African American, furloughed); Jewel Watson (African American, furloughed); Ricky Rivers (African American, dismissed); Merrill Davis (African American, dismissed).

120.    Eric Harrield (African American), the Basketball Program Manager, was dismissed by Defendant HALEY in or about June 2021.

121.    Defendant HALEY told Basketball Manager Eric Harrield that he was "not a cultural fit" for SUCCESS ACADEMY before being dismissed.

122.    Ben Newberg (Caucasian), a basketball coach at Defendant SUCCESS ACADEMY, was also furloughed, but allowed to return during the 2020-2021 schoolyear without having to go through the hiring process again.

123.    However, Jewel Watson (African American) also a basketball coach, was directed to go through the full hiring process all over again by Defendant SUCCESS ACADEMY.

124.    Gregory Perrin, an (African American) was denied promotion despite being promised the position of Basketball Associate.  Not only did SUCCESS ACADEMY deny this promotion, but it also removed the Associate position from the basketball program entirely, but did not do so for the soccer program, which has fewer student participants, fewer students of color, fewer coaches, and fewer coaches of color.  Thus, the elimination of

the Associate position was not race-neutral and motivated by discriminatory animus.

125.     In the 2020-2021 schoolyear, Keshon Bennett (African American), a top performing teacher lead, was furloughed, yet Defendant SUCCESS ACADEMY kept on a less qualified and less experienced white basketball coach.

126.     During Plaintiff TIMES's with Defendant SUCCESS ACADEMY, Defendant HALEY dismissed the following employees: Lisa Bacchus, Manuel Colon, Jerald Times, and Eric Harrield, all of whom are persons of color/non-White.  HALEY dismissed no White workers during TIMES's tenure at Success Academy.

127.     During TIMES's tenure at SUCCESS ACADEMY, on the one hand, every white applicant in the chess program who applied for a promotion received one.  On the other hand, of all the denied promotions in the chess program, only black employees were denied promotion, and no white employees were denied.  Thus, there was clear and overwhelming preferential treatment given to white professionals but not to black professionals at SUCCESS ACADEMY, and specifically in the chess program.

128.     During the 2020-2021 schoolyear, due to program cuts, Defendant SUCCESS ACADEMY closed ten (10) elementary chess programs.  Of those ten (10), only two (2) were in majority white/non-minority communities, while eight (8) were in communities of color.  In fact, Defendant SUCCESS ACADEMY reinstated one (1) of the programs in one (1) of those majority white/non-minority communities, but did not do so for any of the eight (8) programs that were closed in communities of color.

129.     In 2020, Defendant HALEY (Managing Director of Experiential Learning) had three directors under her supervision: Boris Bozic, Sports Director (Caucasian); Pamela Ostroff Intrater (Caucasian), Director of External Enrichment Opportunities; and Plaintiff

TIMES.

130.     Boris Bozic, a white man, did not receive a title change and remained Sports Director.

131.     Pamela Ostroff Intrater, a White woman, received a title change from Director to Manager but incurred no loss of salary.

132.     Jerald Times, an African American male, received a title change and salary loss of approximately $25,000.00.

133.     Besides the title change and the loss of salary, Mr. Times was told by Ms. Haley that he could no longer make executive decisions on the chess program.  Plaintiff TIMES was marginalized as a result of being stripped of his ability to make executive decisions for the chess program.

134.     Plaintiff TIMES was the only director to lose his title, salary, and program ownership simultaneously.

135.     As such, Plaintiff TIMES was treated differently from the white directors on his scholar talent team.

136.     Defendants also treated Plaintiff TIMES differently than other teachers and staff who are not vocal in their opposition to the SUCCESS ACADEMY's discriminatory practices in the terms and conditions of employment.

137.     In November 2020, based on the aforementioned acts of discrimination and retaliation, Plaintiff TIMES was forced to take time off due to stomach spasms and an infection. The spasms and infection were due to working in a hostile work environment and being subjected to severe and pervasive mistreatment by Defendants, including in as follows: being reported to the Human Resources Department; being sent to a disciplinary/correction

meeting; being put on a PIP; having his salary cut; being demoted; being denied a meeting with Eva Moskowitz; and losing ownership of the chess program, which was part of an ongoing pattern and practice of discrimination by Defendants, adversely affecting Plaintiff TIMES and certain of his co-workers, who were also people of color.

138.     Times was the only African American Director on his team, and he was the only one to receive a salary cut and told that he could no longer make executive decisions on the chess program.

139.     Plaintiff TIMES has been treated differently than similarly situated members of SUCCESS ACADEMY who are not vocal in their opposition to the discriminatory treatment, practices, and terms and conditions of their employment.

140.     Defendants' failure to properly investigate Plaintiff TIMES's complaints clearly demonstrates that the SUCCESS ACADEMY condones such deplorable discrimination and retaliation by failing to take any action to curtail the hostile work environment and protect Plaintiff from those supervisors who bullied him, his co-workers who treated him with hatred and disgust simply because of his race, and his supervisors who turned a blind eye and allowed this situation to continue unabated.

141.     In or about June 2020, Liz Baker (Caucasian), who worked at Defendant SUCCESS ACADEMY's Office of Public Affairs, resigned from SUCCESS ACADEMY, and in her resignation letter, she cited to and condemned institutional racism at SUCCESS ACADEMY.  Among other things, Liz Baker stated that she was "disappointed to see how quickly leadership dismissed criticism of racist and abusive practices at their schools and at the network office," and, "I think one of the issues at Success is that employees feel they can't give feedback to leadership, or that our perspective is not valued."

142.     In or about August 2020, Jemina Watsten (Caucasian), Arts Manager at SUCCESS ACADEMY, in her exit interview, told the HR department how badly Defendant HALEY treats TIMES, including public displays of belittling and humiliating behavior directed toward TIMES. Jemina Watsten noticed the frequent bullying and devaluing of TIMES and his work product by HALEY, so much so that she reported it to HR upon her exit from SUCCESS ACADEMY when.

143.     In or about September 2020, during a scheduled Curriculum Meeting, SUCCESS ACADEMY chess teacher David Mbonu (African American) observed and complained to Plaintiff TIMES and Lynn Judy (SUCCESS ACADEMY employee and David Mbonu's supervisor) about Defendant HALEY's mistreatment of the Paintiff TIMES during the meeting, in that she was publicly critical of Plaintiff so as to demean and humiliate Plaintiff in front of his peers.

144.     During Plaintiff TIMES's tenure at Defendant SUCCESS ACADEMY, Defendant HALEY's attrition rate was approximately 60%.  All or nearly all of HALEY's dismissals (forced attrition) were people of color: Manuel Colon, Lisa Bacchus, and Plaintiff JERALD TIMES.  While there were Caucasian/white workers who left of their own volition under Defendant HALEY, none were dismissed by HALEY.

145.     Defendant HALEY's civil rights track record at SUCCESS ACADEMY during Plaintiff TIMES's tenure was nothing short of atrocious, in as follows: internal chess competitions were removed from the Harlem West middle school and put in majority white communities; she only dismissed workers of color; she demoted and dismissed African American Chess Director TIMES; she dismissed an African American Basketball Manager Eric Harrield; she transferred an African American award-winning chess teacher, Tyrell

Harriott; she denied an African American employee Gregory Perrin the Basketball Associate position; she furloughed the mostly black basketball coaches and did not furlough the mostly white soccer coaches; and she gave African American employee Asandoh Jones unscheduled teacher observations and denied him a promotion despite being qualified.

146.     Defendant HALEY and Defendant MORALES worked in tandem with regarding the following discriminatory practices: When Tyrell Harriott complained to the Human Resources department about MORALES's discriminatory behavior, HALEY transferred Harriott out of his building and pushed him out of SUCCESSACADEMY; when MORALES was against the promotion of Asandoh Jones, HALEY gave Jones an unscheduled teacher observation and maneuvered him out of a promotion; and when the relationship between TIMES and MORALES deteriorated and TIMES made and was mentioned in complaints, HALEY targeted TIMES by writing him up on bogus charges of insubordination and ultimately firing TIMES, and she effectively gave MORALES full control and ownership of the program after denying it to and taking it from TIMES.

147.     Under Defendants' discriminatory administration, even African Americans with the highest credentials were not immune to discrimination: Jones Murphy, who has a PhD in physics, was given an invasive background check; Kassaun Henry, who has three Master's degrees and is rated in the top three percent of chess players in the United States, was refused a position and was not hired by SUCCESS ACADEMY; Tyrell Harriott, who is a chess master and won the Teacher Excellence Award, was denied promotion; and Plaintiff TIMES, who won Chess Educator of the Year and wrote the curriculum single-handily, among his many other accomplishments, was demoted and dismissed.

148.     Plaintiff TIMES's supervisor displayed signs of hatred and displeasure towards him, not just because of his race, but also because of his complaints to Human Resources and management, thereby causing a clear violation of his civil rights.

149.     As a result of this intimidating, hostile and immensely stressful work environment, Plaintiff TIMES has sought on a regular basis, therapy and counseling for psychological conditions created by Defendants.

150.     As a result of the discriminatory and retaliatory conduct of the named Defendants, and the failure to remove Plaintiff from this hostile environment, Plaintiff TIMES was unlawfully terminated on November 17, 2022 by Defendant SUCCESS ACADEMY and its Human Resource Department.

151.     Defendant HALEY told Plaintiff TIMES that he was "not a cultural fit" for SUCCESS ACADEMY before being terminated, which HALEY also told Basketball Manager Eric Harrield before he was also terminated in or about June 2021.

152.     The excuse that Defendant HALEY told Plaintiff TIMES and Eric Harrield (African American) after they were dismissed, that they were not a "cultural fit" for SUCCESS ACDEMY, was a euphemism for the discriminatory motives for dismissing them and retaliating against Plaintiff TIMES for his complaints of discrimination on the basis of race.  The given excuse that black employees were not a "cultural fit," or closely similar terms, was a euphemism and/or coded language that HALEY did not use or say to white employees that were dismissed.

153.     As a result of Defendants' actions, Plaintiff TIMES has suffered significant economic loss, severe emotional distress and mental anguish, embarrassment and humiliation, marital problems, insomnia, depression and anxiety.

154.     While Plaintiff TIMES was Director of Chess Program for Defendant SUCCESS ACADEMY, he was a skilled administrator, especially given the condition of the chess program when he arrived.   Plaintiff TIMES created approximately 90% of the program's PowerPoint presentations, created the program's first Key Performance Indicators ("KPIs"), composed the K-8 chess program curriculum singlehandedly, produced extensive teacher evaluations, and created all of the training courses for the chess teachers for 2019.

155.     Plaintiff TIMES also negotiated and/or renegotiated multiple contracts that improved Defendant SUCCESS ACADEMY's chess program and saved SUCCESS ACADEMY thousands of dollars.   In or about May 2019/June 2019, TIMES was instrumental in cancelling the contract with Grandmaster Chess, saving the budget approximately $30,000.00.   In or about September 2020, TIMES renegotiated the contract with Marshall Chess Club, which saved approximately $6,000.00, equivalent to a six-month membership.   In November 2019, Times negotiated with ChessKid to add additional memberships with sixty-two percent (62%) off the regular price, saving Defendant SUCCESS ACADEMY approximately $3,000.00.

156.     During Plaintiff's tenure with Defendant SUCCESS ACADEMY, all internal competitions (which Defendant MORALES was responsible for organizing) were held in white communities (Cobble Hill, Brooklyn, and Upper West Side).   For example, Defendant MORALES decided not to hold the Network Chess Program in a more diverse community, but rather in Cobble Hill, a white community.   All of the training camps were held in white communities, as was the 2019 end-of-year summer camp.   Defendant held none of these events were held in community of color, which has subway access and comprises approximately 83% of Respondent's students.   Defendant SUCCESS ACADEMY refuses to

organize any competitions in the Bronx.  However, many other scholastic chess organizers, including Chess-in-the-Schools and Right Moves, regularly host tournaments in communities of color in New York.  Plaintiff, during his tenure, was able to organize an awards ceremony in Washington Heights, but there were no training camps, summer camps, or intimal competitions held in communities of color while Plaintiff was employed by Defendant SUCCESS ACADEMY.

157.     Defendants' refusal to hold chess tournaments in black neighborhoods was a policy that effectively "redlined" communities of color, despite those communities providing a majority of the student base and a significant source of funding for SUCCESS ACADEMY: eighty-three percent of student population is Black and Brown; approximately 18,000 students attend SUCCESS ACADEMY schools, which translates to approximately 14,940 students of color; SUCCESS ACADEMY received approximately $16,888.00 for every student that attends a school in its charter network; SUCCESS ACADEMY received over $252 million dollars in State funding from Black and Brown communities; and SUCCESS ACADEMY received over $1 billion every four years from Black and Brown communities.  Despite receiving its student base and significant funding from Black and Brown communities, SUCCESS ACADEMY still chose to withhold resources and internal competitions from them.

158.     Under Plaintiff TIMES's direction, SUCCESS ACADEMY won its first United States Chess Federation sanctioned national championship in May 2019.  In fact, during Plaintiff's brief tenure, SUCCESS ACADEMY won four (4) national titles.

159.     Plaintiff TIMES complained about Defendants' discriminatory failure to promote Harriott and retaliatory attempts to transfer him in May 2020.  In less than two (2)

months after Plaintiff's complaint, he received an unfairly negative evaluation that was not supported by fact.  On June 30, 2020, Plaintiff complained again. Six (6) weeks after this complaint, Plaintiff was placed on a PIP despite his accomplishments, and Defendant HALEY started undermining Plaintiff's ability to perform his job duties.  Two (2) months later, and just after Tyrell Harriott filed a complaint with the EEOC mentioning Plaintiff TIMES as a witness to his discrimination, Defendant HALEY demoted Plaintiff, and ultimately terminated his employment.

**AS AND FOR A FIRST CLAIM FOR**
**RACE DISCRIMINATION IN VIOLATION OF**
**<u>TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>**

160.     Plaintiff repeats and re-alleges paragraphs 1 through 159 and incorporates them by reference as if fully stated herein.

161.     Defendant SUCCESS ACADEMY, by and through its agents, engaged in a pattern and practice of discrimination against him with respect to the terms, conditions and privileges of employment based upon Plaintiff's race in violation of 42 U.S.C. § 2000e-2.

162.     As part of its pattern and practice of employment discrimination, Defendant SUCCESS ACADEMY, by and through its agents, treated Plaintiff in a manner indicative of race discrimination.

163.     Defendant SUCCESS ACADEMY knew, or should have known, about this race discrimination in the workplace.

164.     Defendant SUCCESS ACADEMY failed, and refused, to take appropriate action to end the discriminatory treatment and conditions which Plaintiff was subjected to, which was clearly motivated by race and in a clear demonstration of bad faith.

165.     As a result of the discriminatory acts of Defendant SUCCESS ACADEMY

under color of law, by and through its agents, Plaintiff suffered economic damages, emotional distress, humiliation and embarrassment, and legal and related expenses.

166.　　　Because of the foregoing, Plaintiff has been damaged in the amount of Five Million Dollars ($8,000,000.00).

## AS AND FOR A SECOND CLAIM FOR
## RETALIATION IN VIOLATION OF
## <u>TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>

167.　　　Plaintiff re-alleges paragraphs 1 through 166 and incorporates them by reference as if fully stated herein.

168.　　　Defendant SUCCESS ACADEMY, by and through its agents, engaged in retaliation against Plaintiff as a result of his lawful complaints, both formal and informal, about the discriminatory treatment in his workplace in violation of 42 U.S.C. §2000e-3(a).

169.　　　Defendant SUCCESS ACADEMY, by and through its agents, engaged in retaliation against Plaintiff as a result of his being mentioned and named as a witness, and his giving truthful testimony, in regard to a lawful complaint about the discriminatory treatment in his workplace in violation of 42 U.S.C. §2000e-3(a).

170.　　　Defendant SUCCESS ACADEMY knew, or should have known, about the retaliation in the workplace.

171.　　　Defendant SUCCESS ACADEMY failed, and refused, to take appropriate action to end the retaliatory treatment and conditions that Plaintiff was subjected to, in a clear demonstration of bad faith.

172.　　　As a result of the retaliatory acts of Defendants, by and through its agents, under color of law, Plaintiff suffered economic damages, emotional distress, humiliation and

embarrassment, legal and related expenses.

173.     Because of the foregoing, Plaintiff has been damaged in the amount of Five

Million Dollars ($8,000,000.00).

### AS AND FOR A THIRD CLAIM FOR
### HOSTILE WORK ENVIRONMENT IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

174.     Plaintiff re-alleges paragraphs 1 through 173 and incorporates them by

reference as if fully stated herein.

175.     Defendant SUCCESS ACADEMY, by and through its agents, created and

condoned a hostile work environment against Plaintiff in violation of 42 U.S.C. §2000e-3(a).

176.     As a result of the severe and pervasive discriminatory and retaliatory acts of

Defendant SUCCESS ACADEMY, by and through its agents, under color of law, Plaintiff

suffered economic damages, emotional distress, humiliation and embarrassment, legal and

related expenses.

177.     Because of the foregoing, Plaintiff has been damaged in the amount of Five

Million Dollars ($8,000,000.00).

### AS AND FOR A FOURTH CLAIM FOR
### RACE DISCRIMINATION IN VIOLATION OF
### NEW YORK STATE EXECUTIVE LAW § 296 AGAINST ALL DEFENDANTS

178.     Plaintiff re-alleges Paragraphs 1 through 177 and incorporates them by

reference as if fully stated herein.

179.     New York State Executive Law § 296, et seq., makes it unlawful to

discriminate against any individual in the terms, conditions, or privileges of employment

based upon race.

180.     Based upon the foregoing, Defendants, by and through its agents, discriminated and retaliated against Plaintiff on the basis of race.

181.     As a direct and proximate result of the unlawful employment practices of Defendants, by and through its agents, he has suffered the indignity of discrimination on the basis of race, retaliation and great humiliation.

182.     Because of Defendants' violations, he has suffered economic damages, emotional distress, humiliation and embarrassment, legal and related expenses.

183.     Because of the foregoing, Plaintiff has been damaged in the amount of Five Million Dollars ($8,000,000.00).

**AS AND FOR A FIFTH CLAIM FOR
RETALIATION IN VIOLATION OF
<u>NEW YORK STATE EXECUTIVE LAW § 296 AGAINST ALL DEFENDANTS</u>**

184.     Plaintiff re-alleges Paragraphs 1 through 183 and incorporates them by reference as if fully stated herein.

185.     New York State Executive Law § 290, et seq., makes it unlawful to retaliate against any individual in the terms, conditions, or privileges of employment for engaging in protected activity, i.e., for complaining about discrimination.

186.     Based upon the foregoing, Defendants unlawfully retaliated against Plaintiff for complaining about the unlawful employment practices to which he has been subjected.

187.     As a direct and proximate result of the unlawful employment practices of Defendants, by and through its agents, he has suffered the indignity of discrimination on the basis of race, retaliation and great humiliation.

188.     Because of Defendants' violations, he has suffered economic damages, emotional distress, humiliation and embarrassment, legal and related expenses.

189.     Because of the foregoing, Plaintiff has been damaged in the amount of Five Million Dollars ($8,000,000.00).

**AS AND FOR A SIXTH CLAIM FOR
HOSTILE WORK ENVIRONMENT IN VIOLATION OF
NEW YORK STATE EXECUTIVE LAW § 296 AGAINST ALL DEFENDANTS**

190.     Plaintiffs re-allege Paragraphs 1 through 189 and incorporate them by reference as if fully stated herein.

191.     New York State Executive Law § 296, et seq., makes it unlawful to create, condone and/or tolerate a hostile work environment based upon race, free speech and other protected classifications.

192.     Based upon the foregoing, Defendants, by and through its agents, created, condoned and tolerated a hostile work environment which negatively affected the terms and conditions of his employment.

193.     Because of Defendants' hostile work environment, he has suffered economic damages, emotional distress, humiliation and embarrassment, legal and related expenses.

194.     Because of the foregoing, Plaintiff has been damaged in the amount of Five Million Dollars ($8,000,000.00).

**AS AND FOR A SEVENTH CLAIM PURSUANT TO
42 U.S.C. § 1983 FOR EQUAL PROTECTION VIOLATIONS
AGAINST ALL INDIVIDUAL DEFENDANTS**

195.     Plaintiff re-alleges Paragraphs 1 through 194 and incorporates them by reference as if fully stated herein.

196.     The individual Defendants have embarked on a course of conduct that deprived Plaintiff of his rights under the United States Constitution, federal and state law.

197.    All of the acts and conduct of Defendants, by and through its agents, herein stated were done under color of state law, while in the performance of their duties as Supervisors for SUCCESS ACADEMY.

198.    The facts and circumstances cited above are in violation of Plaintiff's Fourteenth Amendment right under the Equal Protection Clause of the United States Constitution to be free from retaliation, discrimination and harassment in his employment with SUCCESS ACADEMY.

199.    Defendants failed to properly investigate and address the allegations made by the Plaintiff of discrimination and hostile work environment, and retaliated and harassment by this same Defendant against Plaintiff for lawfully speaking out against Defendants regarding their unlawful conduct.

200.    Defendants' violations as SUCCESS ACADEMY supervisors, i.e. their failure to take any remedial and/or corrective action when specifically called upon to mediate prevalent discrimination, retaliation, and hostile working conditions, all under their control and supervision, of which they knew or should have known the existence of, caused Plaintiff to sustain extensive economic damages, emotional distress, humiliation and embarrassment, legal and related expenses.

201.    By these actions, Defendants have jointly and separately deprived Plaintiff of his rights under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983 and New York State Executive Law § 296.

202.    Because of the foregoing, Plaintiff has been damaged in the amount of Five Million Dollars ($8,000,000.00).

### AS AND FOR AN EIGHTH CLAIM FOR RACE DISCRIMINATION
### IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE
### <u>CODE § 8-101 AGAINST ALL INDIVIDUAL DEFENDANTS</u>

203.     Plaintiff re-alleges Paragraphs 1 through 202 and incorporates them by reference as if fully stated herein.

204.     New York City Administrative Code §8-101 et seq., makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race.

205.     Based upon the foregoing, Defendants, by and through its agents, discriminated against the Plaintiff on the basis of race which negatively affected the terms and conditions of his employment.

206.     As a direct and proximate result of the unlawful employment practices of Defendants, by and through its agents, he has suffered the indignity of discrimination on the basis of race, retaliation and great humiliation.

207.     Because of Defendants' violations, he has suffered economic damages, emotional distress, humiliation and embarrassment, legal and related expenses.

208.     Because of the foregoing, Plaintiff has been damaged in the amount of Five Million Dollars ($8,000,000.00).

### <u>JURY TRIAL</u>

209.     Plaintiff demands a trial by jury on all issues in this action that are so triable.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff JERALD TIMES prays that this honorable Court grant the following relief:

(a) Declare that the aforementioned actions of Defendants were unconstitutional and in violation of the United States Constitution, the New York State Constitution and New York City Human Rights Law and Administrative Code, along with all applicable statutes;

(b) Declare that the aforementioned discriminatory actions of Defendants were in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983, and New York State Executive Law § 296, et seq.;

(c) As and for Plaintiff's First Claim, grant Plaintiff the sum of $8,000,000.00;

(d) As and for Plaintiff's Second Claim, grant Plaintiff the sum of $8,000,000.00;

(e) As and for Plaintiff's Third Claim, grant Plaintiff the sum of $8,000,000.00;

(f) As and for Plaintiff's Fourth Claim, grant Plaintiff the sum of $8,000,000.00;

(g) As and for Plaintiff's Fifth Claim, grant Plaintiff the sum of $8,000,000;

(h) As and for Plaintiff's Sixth Claim, grant Plaintiff the sum of $8,000,000.00;

(i) As and for Plaintiff's Seventh Claim, grant Plaintiff the sum of $8,000,000.00;

(j) As and for Plaintiff's Eighth Claim, grant Plaintiff the sum of $8,000,000.00;

(k) Grant Plaintiff all costs for this action, including reasonable attorney's fees; and

(l) Grant Plaintiff such other and further relief as this Court may deem just and proper.

Dated: April 18, 2023
      Lake Success, New York

                    Respectfully submitted,

                    AVALLONE & BELLISTRI, LLP
                    Attorneys for Plaintiff

                    By:    _Rocco G. Avallone_
                          ROCCO G. AVALLONE
                    3000 Marcus Avenue, Suite 3E07
                    Lake Success, New York 11042
                    516-986-2500

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 01/25/2023

**To:** Jerald Times
676 St Nicholas Avenue
New York, NY 10030

Charge No: 16G-2021-01145

EEOC Representative and email:   TIMOTHY RIERA
Deputy Director
Timothy.Riera@eeoc.gov

## DISMISSAL OF CHARGE

The EEOC is closing this charge because: Charging Party wishes to pursue matter in Federal District Court.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
01/25/2023

Timothy Riera
Acting District Director

**Cc:  Success Academy NYC Charter Schools**
**Attn: Director of Human Resources**
**95 Pine Street**
**6th Floor**
**New York NY 10005**

Please retain this notice for your records.