```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
Jerald Times,                          :
                      Plaintiff,       :
                                       :   23cv3229 (DLC)
            -v-                        :
                                       :   OPINION AND
                                       :   ORDER
Success Academy Charter Schools, Inc., :
et al.,                                :
                      Defendants.      :
                                       :
-------------------------------------- X
```

APPEARANCES:

Plaintiff Jerald Times, appearing pro se

For defendants:
Diane Windholz
Laura Victorelli
Jackson Lewis P.C.
666 Third Avenue
New York, NY, 10017


DENISE COTE, District Judge:

    Jerald Times has sued Success Academy Charter Schools, Inc. ("Success Academy") and three of its employees for race discrimination and retaliation.  Success Academy employed Times to lead its chess program for almost two years.  He was fired in November of 2020.  Following the completion of discovery, the defendants have moved for summary judgment on each of Times's claims.  For the following reasons, the motion is granted in part.

**Background**

The following facts are taken from the evidence submitted
in connection with the summary judgment motion.  The facts are
undisputed or taken in the light most favorable to the
plaintiff, unless otherwise noted.

I.    Success Academy Hires Times.

Success Academy operated a network of approximately 53
charter schools in New York City during the period relevant to
this litigation.  Success Academy offered chess programs in
approximately 35 of its elementary and middle schools, which
included chess instruction in clubs, elective courses, end-of-
year camp programs, internal tournaments within the Success
Academy network, and participation in external tournaments.

In or around August of 2018, Success Academy began a search
for a new Chess Manager to oversee its chess program.  Times,
who describes himself as an African American male, applied for
the position.  Times had a Bachelor's Degree and had worked as a
chess coach and chess director in various schools and programs
in New York and South Africa.

Defendant LaMae de Jongh, the Chief Schooling Officer, who
is African American, and Eva Moskowitz, Success Academy's CEO,
who is Caucasian, interviewed Times.  Defendant Matthew Morales,
who is Latino, also applied for the Chess Manager position.

Morales had been working as a chess teacher at Success Academy since 2012 and had been serving as Acting Chess Manager for several months.

In January of 2019, Success Academy created a new position of Director of Chess and hired Times for that role. As Director of Chess, Times would oversee Success Academy's entire chess program. Times reported to defendant Heather Haley, the Managing Director of Experiential Learning, who is Asian. Haley, in turn, reported to de Jongh, and de Jongh reported to Moskowitz. Times began his employment on January 28, 2019 at an annual salary of $150,000.

Meanwhile, de Jongh appointed Morales Chess Manager. As Director of Chess, Times supervised Morales and others.

During the remainder of the 2018-2019 school year, Times reported late or left early on at least nine occasions. Times also missed several deadlines, including deadlines for reconciling chess program credit card accounts, creating a budget, attending cyber security training, and preparing functional goals. In the first months of the 2019-2020 school year, he requested time off at the last minute or took time off without notice on at least five occasions.

II.  January 2020:  Reallocation of Responsibilities and First
     Performance Review

During January of 2020, Times was given his first
performance review and several of his responsibilities were
reorganized.  Times chose which of his responsibilities he would
retain.  Event planning and logistics, travel arrangements, and
chess program budgeting were reassigned to Morales.

In the performance review, Haley highlighted several of
Times's "key wins," including the creation of after-school and
competitive programming, opening a nationwide hiring pipeline,
and filling teacher vacancies.  Haley also identified several
areas as needing additional attention, including budget
management, curriculum development, and teacher retention and
training.

Haley also identified several "Development Needs".  These
included Times's ability to plan ahead and meet deadlines and
provide clarity and transparency on the chess program's
expectations of teachers and students.  Haley noted that Times
had missed several deadlines and had frequently made requests
for time off at the last minute.  She added that Times needed to
take ownership of budget management, teacher training on
curriculum, and "[r]elationship development" between Times and
school leadership.

4

On January 27, Times emailed Haley regarding his performance review.  He stated that he was "marginalized at times as an outsider to [Success Academy] protocols," and listed his achievements, including writing the chess curriculum, training highly rated players, recruiting nationally, and calculating the metrics of gender ratios and cost per child in the chess program.  Haley responded that, while Times had "done a lot for the program," he also had "more to develop[], particularly in building trust between yourself and the [Senior Leaders]."[1]  She stated that this trust was "important if you want to influence decisions, inclusive of promotions."  Times replied that the lack of trust is "inconsistent with my performance" and stated that "[t]heir so called lack of trust does not define me."  Haley responded on January 28 and said "we can talk about this more."  The same day, Times responded that he "would not use Senior Leader perceptions as part of my evaluation" and offered to discuss the matter with Human Resources.

III. June 2020:  Second Performance Review

In June of 2020, Haley issued Times's end-of-year performance review.  The review stated that Times had shown "tremendous growth" and noted several areas in which Times had

---

[1] Senior Leader appears to be the title that Success Academy uses for its school principals.

succeeded, including the development of the new K-8 chess curriculum and the transition to remote learning in response to the COVID-19 pandemic.  It also listed several of Times's strengths, including his innovative ideas, chess mastery and curriculum development, advocacy for chess teachers, and "growth mindset."

The review also identified several areas in which Times needed improvement.  It stated that Times often missed deliverables and needed reminders to get things done; that he was not "always a concise or logical thinker;" and that he was not able to manage personnel, time or money effectively.  Times received a "2" or "Below Expectations" as his performance rating for the year.

VI.  August 2020:  Times Receives a Development Plan.

In August of 2020, shortly before the start of the 2020-2021 school year, Haley issued a development plan for Times. The plan listed Times's responsibilities and identified areas in which development was necessary, including talent acquisition and development, chess teacher staffing, programming, and curriculum development.

On August 14, Times emailed Haley and stated that he was not sure he needed a development plan because his contributions

to Success Academy's chess program had been "unprecedented and substantial."  Haley responded:

> This plan should by no means diminish any of your accomplishments though I think we need to distinguish between executing on your role versus excelling. These are things that you are expected to do like create a chess calendar that identifies all of our tournaments for a year or create a remote learning plan for chess or write a chess curriculum.  These are table stakes so to speak -- this is what you were hired to do.

Haley stated that the plan outlined deliverables for the next three months, as well as skills that Times needed to improve on, including "clearer communication, both written and orally, to chess teachers, school leadership, network teams, and chess families."

Times responded the same day, listing duties he had executed well and describing the chess program's growth under his leadership.  He further questioned why he was "being singled out with a development plan," whether anyone else was asked to go through a development plan, and why his accomplishments, such as procuring extra memberships for remote learning, increasing chess camp participation, researching gender ratios, and writing "T-school" courses, were not mentioned.  He concluded by asking that "any evaluation of my work be fair and take into account my tireless execution and accomplishment."

VI.  October 2020:  Times is Demoted to Chess Manager.

At the beginning of the 2020-2021 school year, Success Academy conducted a review of the titles, salaries, and duties of its network-based employees with the goal of ensuring that job titles matched employees' responsibilities and were consistent throughout the organization.  De Jongh and Haley decided to "relevel" Times's position to Chess Manager and reduce his annual salary by $25,000 to $125,000.  Morales's title as Chess Manager remained unchanged, as did his annual salary of $86,700.

On October 16, Times emailed Moskowitz, attaching his response to Haley's performance evaluation and to his demotion. Times stated that, on October 9, Haley had informed Times that he was being demoted to Chess Manager because he had not filled his role as Chess Director, his work product was not equal to that of other directors, and he did not have the ability to manage people.  Times stated that he strongly disagreed with the evaluation and asked that his title and position be reinstated. He summarized his achievements including creating a new recruitment model, developing and writing a chess curriculum, improving the chess team's performance, and leading a successful transition to online learning.  He also asserted that he administered the program "by himself" for twenty percent of his

tenure while Morales was on paternity leave or sick leave.  He asked that Moskowitz consider allowing him full management of the chess program and the possibility of building his own team. On October 18, Moskowitz responded that the releveling is "'NOT' a devaluing" but rather "a norming re scope and swath."

On October 21, Times emailed Aparna Ramaswamy, a human resources representative, about his performance evaluation and the change to his title.  He inquired whether his salary would be changed and to what extent.  He requested a written explanation of why he did not perform his role as director and a copy of his employment contract.  Ramaswamy added Robin Trainor, another human resources representative, to the thread, and said that Trainor would address Times's concerns.  On October 22, Times responded, "I think this re-norming has to be a part of a larger discussion about unconscious bias in the [Success Academy] organization."  On October 28, Trainor met with Times and told him that the re-leveling of his position was appropriate based on his past performance reviews and the distribution of director-level responsibilities between himself and Morales.

VII. November 2020:  Times's Employment is Terminated.

On Monday, November 2, Times emailed Haley and said that he was ill and would be out sick for the rest of the week.  On

9

November 7, Times again emailed Haley and said that he would be
out at least five more days.  He also suggested that Morales
conduct a presentation that was scheduled for November 17.
Haley responded that Times's absence required human resources to
be involved.  On November 9, human resources assistant Symona
Serna sent Times information about how to apply for a leave of
absence.  Times responded on November 10, attaching a doctor's
note and saying that he did not think a leave of absence was
required.[2]

Also on November 10, Haley emailed Trainor on the same
chain, asking to speak about Times and saying that she would
"like to better understand whether or not I can press for his
decision on his role and whether he chooses to remain with SA
while he's out sick."  She then forwarded the chain to de Jongh,
describing Times's requests for time off.  She also stated that
she had requested to meet with Trainor to determine next steps,
"particularly as it relates to needing his decision on his
revised role."

Also on November 10, Serna emailed Times and stated that
the first five days of his absence were covered by Times's
remaining paid time off ("PTO") but that after that he would
need to apply for a leave of absence.  Later that morning, Times

---

[2] No party has provided a copy of the doctor's note.

emailed Haley and requested five additional days off from work, from November 10 to November 16, and stated that he would be able to return on the 17th.  Haley agreed that Times could use PTO to cover his absence; she stated, however, that the "unexpected and last minute request has left us with little to no coverage on your deliverables" and listed several responsibilities that were impacted.

Times responded early on November 12, stating, "[l]et's be clear that for 20 percent of my tenure I administered the program all by myself," and describing projects he handled while Morales was on paternity leave or sick leave.  Haley forwarded this response to Trainor.  On November 17, 2020, Haley and De Jongh terminated Times's employment.

VIII.    Lawsuit

The plaintiff filed this action on April 18, 2023, at which time he was represented by the firm Avallone & Bellistri LLP. At a conference on November 3, fact discovery was set to close on March 1, 2024, and any motion for summary judgment was due on March 22.  On February 20, the deadline for a motion for summary judgment was extended to April 19 and the parties were permitted to extend discovery to April 19 on consent.  The parties attended a mediation conference on December 27, 2023.  On

February 12, 2024, the mediator reported that mediation had been
unsuccessful.

On April 2, 2024, Times's counsel moved to withdraw as
plaintiff's attorney.  The plaintiff was given an opportunity to
object, but did not.  On April 19, the defendants filed the
instant motion for summary judgment.  On April 23, the motion to
withdraw was granted and the action was stayed until May 9 so
that the plaintiff could secure new counsel or file his own
notice of appearance.  On May 6, the stay was extended until May
16.  On May 14, the plaintiff filed a notice of pro se
appearance.

The defendants renewed their motion for summary judgment on
May 28.  Times's opposition was due on July 29.  Times responded
to the motion in waves and with voluminous, repetitive
submissions.  The plaintiff filed materials on July 30 and 31
and on August 2, 5, and 9.  An Order of August 20 described the
submissions made by Times and indicated which of those filings
the defendants should consider in their reply.  The filings the
Court identified as the plaintiff's opposition included a 174-
page memorandum in opposition to the motion for summary
judgment, an 87-page response to the defendants' Rule 56.1
statement, 227 pages of additional statements prepared by the

plaintiff,[3] eight witness affirmations, and 41 exhibits.  On
August 27, the plaintiff filed an 11-page summary of his
memorandum in opposition to the motion for summary judgment as
well as an additional witness affirmation.  The Court instructed
the defendants to consider the August 27 submission as well.
The motion for summary judgment was fully submitted on October
7.

### Discussion

Summary judgment may only be granted when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  Material facts are those facts that "might
affect the outcome of the suit under the governing law."  Choi
v. Tower Rsch. Cap., LLC, 2 F.4th 10, 16 (2d Cir. 2021)
(citation omitted).  "Summary judgment must be rejected if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  Indemn. Ins. Co. of N. Am. v.
Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation
omitted).  The court's role is "not to resolve disputed
questions of fact but solely to determine whether, as to any
material fact, there is a genuine issue to be tried."  Moll v.

---

[3] The 227 pages were comprised of four statistical analyses and
seven separate statements.

13

<u>Telesector Res. Grp., Inc.</u>, 94 F.4th 218, 227 (2d Cir. 2024)
(citation omitted).

In determining whether genuine issues of fact exist, the
court "must review the record taken as a whole" and "must draw
all reasonable inferences in favor of the nonmoving party." <u>Id.</u>
(citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133,
150 (2000)). A court "may not make credibility determinations
or weigh the evidence." <u>Id.</u> (citation omitted). "Reliance upon
conclusory statements or mere allegations," however, "will not
suffice to defeat summary judgment." <u>Id.</u> (citation omitted).
When the nonmoving party has "failed to make a sufficient
showing on an essential element of her case with respect to
which she has the burden of proof," summary judgment is proper.
<u>Id.</u> (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23
(1986)). But if "the admissible materials in the record <u>make it</u>
<u>arguable</u> that the claim has merit, then summary judgment
dismissing a claim cannot be granted." <u>Id.</u> (citation omitted)
(emphasis in original).

"A court is ordinarily obligated to afford a special
solicitude to <u>pro se</u> litigants . . . particularly where motions
for summary judgment are concerned." <u>Harris v. Miller</u>, 818 F.3d
49, 57 (2d Cir. 2016) (citation omitted). A court must
therefore "liberally construe" the submissions of <u>pro se</u>

14

litigants, "reading such submissions to raise the strongest arguments they suggest." Id. at 56 (citation omitted). Additionally, in a discrimination action, an "extra measure of caution is merited" before granting summary judgment because "direct evidence of discriminatory intent is rare." Moll, 94 F.4th at 227 (citation omitted). Thus, "the court must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination." Id. (citation omitted).

The plaintiff brings eight claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1983 ("§ 1983"); the New York State Human Rights Law, N.Y. Exec. Law. § 290 et seq. ("NYSHRL"); and the New York City Admin Code § 8-101 et seq. ("NYCHRL"). He asserts under each of these statutes that he was discriminated against on the basis of his race when he received unfairly negative performance reviews, was demoted from Chess Director to Chess Manager, and was wrongfully fired. He also brings retaliation claims under Title VII and the NYSHRL, arguing that he received negative performance reviews, was demoted, and had his employment terminated in retaliation for his report in October of 2019 that a Success Academy employee, Giovanni Merritt, had

experienced an incident of discrimination, for his assistance
with the discrimination complaint made by Success Academy
employee Tyrell Harriott, his opposition to the termination of
Harriott's employment, and his own complaints regarding
discrimination in October of 2020.  He also brings hostile work
environment claims under Title VII and the NYSHRL.  All of his
claims under Title VII are against Success Academy only; his
claims under the NYSHRL are against all defendants.  Finally, he
brings claims under § 1983 for equal protection violations and
under the NYCHRL for race discrimination against the individual
defendants.  The motion for summary judgment on each of the
plaintiff's claims is addressed below.  After addressing the
claims of discrimination, the Opinion addresses the claims for
retaliation and a hostile work environment.  Finally, the
Opinion addresses the plaintiff's requests for additional
discovery.

I.   Discrimination

        Times brings claims of employment discrimination based on
his race against Success Academy and the individual defendants.
The defendants are entitled to summary judgment on each of these
claims.

16

A.   Title VII

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Under Title VII, intentional discrimination is known as "disparate treatment" discrimination.  Bart v. Golub Corp., 96 F.4th 566, 569 (2d Cir. 2024).  To succeed on such a claim, a plaintiff must prove discrimination "either by direct evidence of intent to discriminate or, more commonly, by indirectly showing circumstances giving rise to an inference of discrimination." Id. (citation omitted).

Direct evidence is evidence that "the employer's motivation was discriminatory on its face," including "statements or actions by the employer's decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude." Porter v. Dartmouth-Hitchcock Med. Center, 92 F.4th 129, 149 (2d Cir. 2024) (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)) (emphasis omitted).  Because direct evidence of discriminatory intent is "rarely" available, "[c]ircumstantal evidence is often the sole avenue available to most plaintiffs to prove discrimination."  Bart, 96 F.4th at 569

17

(citation omitted).  When only circumstantial evidence of discriminatory intent is available, disparate treatment claims are analyzed under the <u>McDonnell Douglas</u> burden-shifting framework to assess "whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment."  <u>Id</u>. (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).

To establish a prima facie case of discrimination under the <u>McDonnell Douglas</u> framework, a plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." <u>Bart</u>, 96 F.4th at 570 (citation omitted).  The burden at this stage is "not onerous."  <u>Id</u>. (citation omitted).

A plaintiff may establish an inference of discriminatory intent through various kinds of evidence, including "criticism of the plaintiff's performance in ethnically degrading terms" or an employer's "invidious comments about others in the employee's protected group." <u>Littlejohn v. City of New York,</u> 795 F.3d 297, 312 (2d Cir. 2015) (citation omitted).  A plaintiff may also raise an inference of discrimination by showing that an employer "treated plaintiff less favorably than a similarly situated employee outside the plaintiff's protected group."  <u>King v. Aramark Services Inc.</u>, 96 F.4th 546, 563 (2d Cir. 2024)

(citation omitted).  To make this showing, however, there must

be "a reasonably close resemblance of the facts and

circumstances of plaintiff's and comparator's cases."  Id.

(citation omitted).  While a finding that comparators are

similarly situated "does not require a precise identicality

between comparators and the plaintiff," such a finding does

require "an objectively identifiable basis for comparability."

Id. (citation omitted).

Once the plaintiff has established a prima facie case, the

burden shifts to the employer to "articulate some legitimate,

nondiscriminatory reason for its adverse action."  Bart, 96

F.4th at 570 (citing McDonnell Douglas, 411 U.S at 802).  If the

employer makes such a showing, "the burden then shifts back to

the plaintiff to prove that the employer's stated reason was

pretext for discrimination."  Id.  The plaintiff is "not

required to demonstrate the falsity of the employer's proffered

reason," but can instead prove "that an impermissible factor was

a motivating factor, without proving that the employer's

proffered explanation was not some part of the employer's

motivation."  Id. (citation omitted) (emphasis in original).

The parties do not dispute that the plaintiff belongs to a

protected class, was qualified for his position, and suffered

adverse employment actions.  The plaintiff has identified four

19

adverse employment actions: his January and June 2020 negative performance reviews, the January 2020 reallocation of his responsibilities, his October 2020 demotion, and the termination of his employment in November 2020.

With a single exception discussed below, Times has not argued that use of discriminatory language is evidence of a discriminatory intent.  Times principally attempts to raise an inference of discrimination by listing his many accomplishments, including developing a new chess curriculum and opening a nationwide hiring pipeline for new teachers.  He next attempts to identify comparators who were treated more favorably than he was.  That effort fails.  Finally, he relies on evidence attempting to show that Success Academy has generally conducted its operations in a manner that is discriminatory against its staff and students, although not against him personally.  That argument will be addressed last.

A. Performance Reviews

The plaintiff asserts that his negative performance reviews in January and June of 2020 were discriminatory.  Negative performance reviews, "without any showing of a negative ramification, cannot constitute an adverse employment action." Natofsky v. City of New York, 921 F.3d 337, 352 (2d Cir. 2019). But when a negative evaluation "altered compensation, benefits,

20

or job title," the evaluation may be considered an adverse employment action.  Id. (citation omitted).  The defendants do not argue that the performance reviews were not adverse employment actions.  Times's January 2020 performance review contributed to the reallocation of his duties, and his June 2020 performance review led to his placement on a development plan; together, these reviews and their consequences contributed to Times's demotion to Chess Manager.  Therefore, the performance reviews are considered adverse employment actions.

Nevertheless, Times has not established that the performance reviews were discriminatory.  Times does not deny most of the specific criticisms; for instance, he does not deny that was frequently late to work and left early, that he made last-minute requests for time off, was late in "deliverables", and had difficulty with budget management.

While Times contends that the "deliverables" were late due to organizational issues beyond his control, he does not further describe the issues to which he is referring or provide evidence of these issues.  Notably, Times did not raise this excuse in the emails he sent in response to his performance reviews.  This conclusory statement, therefore, does not raise an issue of fact.  See S. Katzman Produce Inc. v. Yadid, 999 F.3d 867, 877 (2d Cir. 2021).

21

To be sure, it is not disputed that Times accomplished much in his time at Success Academy.  He created chess clubs for students in kindergarten through second grade, opened a nationwide pipeline for teacher hiring, and held successful chess tournaments.  He developed a new chess curriculum and courses for teacher training.  He calculated the gender breakdown of participants in Success Academy's chess programs and brought in speakers to address issues such as gender equity in chess.  Nevertheless, Times's difficulties in meeting deadlines and his inconsistent attendance and responsiveness were well-documented.  Times has not shown evidence that his performance reviews were discriminatory.

Times next argues that he was more harshly evaluated than a comparator.  To support this claim, he argues that Morales received favorable reviews despite lacking certain qualifications and despite his performance deficiencies.  This argument fails.

Morales is not an appropriate comparator.  At the time of Times's performance reviews, Morales had been an employee at Success Academy for many years.  In January of 2020, Morales's was Times's subordinate.  In June of 2020, although Morales reported directly to Haley, he still had a different title and

different responsibilities than Times and received significantly lower pay.

It is worth noting nonetheless that Morales also received coaching on his performance.  For instance, in Morales's 2020 end-of-year performance review, Haley largely praised Morales but criticized him for not being "seen as objective in his thinking" and having difficulty specifying and communicating his expectations to his own subordinates.  And while Times now argues that Morales was not qualified for the job of Chess Manager, Times himself praised Morales's performance in his 2019 end-of-year performance review of Morales.  Times applauded Morales, for example, for his excellence in completing administrative tasks, for his management of a chess team that won a national championship, for his knowledge of the Academy's chess program, and for being tech savvy.  Although Times said that Morales was "sometimes resistant to change," "should focus on his organization skills," and needed to be "less critical" of teachers, he gave Morales a score of "3" or "meets expectations" and did not refer to any of the deficiencies in Morales's performance to which he now points.

Even if Times had offered evidence to support a prima facie case of discrimination, however, he has not identified evidence to refute the legitimate, non-discriminatory reasons that the

defendants have put forward in support of the two performance reviews.  Times has not offered evidence to dispute that the performance evaluations accurately reflected the deficiencies in his performance, including tardiness, late deliverables, and his difficulties in managing time, money, and personnel.  While Times argues that the performance reviews were unfairly negative in light of his achievements and qualifications, a plaintiff's subjective disagreement with his reviews is not evidence of discrimination.  An employer is entitled to set its own standards for its employees' satisfactory job performance.  Ya-Chen Chen v. City Univ. of H.Y., 805 F.3d 59, 73 (2d Cir. 2015); Thornley v. Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997).

Finally, Times asserts that his performance reviews were unfairly negative because Haley lacked the experience to evaluate him properly.  A reviewer's level of experience is not evidence of discrimination.  Times has therefore not shown that his performance reviews were discriminatory, and this claim fails.

B. Demotion

Times next argues that his demotion in October 2020 was discriminatory.  Times does not dispute that Moskowitz and de Jongh engaged in an organization-wide releveling project in the fall of 2020 that affected many managers in addition to him, and

24

that they decided to demote him as part of that reorganization. It is noteworthy that these executives were the same two individuals who had hired him and had created a position for him at a higher level than the one for which he had applied. To create an inference of discrimination in these circumstances, Times points to two white Directors, Boris Bozic and Pamela Ostroff-Intrater, as purported comparators.

Times has failed to offer evidence that either of these two individuals is an appropriate comparator. To begin with, Ostroff-Intrater was demoted from Director to Manager, as was Times. While Times argues that her treatment was less severe than his, he does not explain what he means or offer admissible evidence to that effect. As for Bozic, Times does not offer evidence regarding his qualifications, performance or employment history to allow an assessment as to his fitness to serve as a comparator.

Moreover, the defendants have offered evidence of the legitimate business purpose for the re-leveling project, which was carried out across the organization. The defendants explain that Success Academy conducted a "business-driven review of titles" to ensure that job titles matched actual responsibilities and that they were consistent throughout the organization. Because Times was already sharing

25

responsibilities with Morales, his title and salary were reduced to be commensurate with those responsibilities. Even then, Times's new salary of $125,000 was approximately $35,000 more than Morales's salary. For this additional reason, this claim of discrimination fails.

C. Termination of Employment

Finally, Times argues that the termination of his employment, which occurred on November 17, 2020, was discriminatory. As Times recognizes, Success Academy fired him because he refused to accept his demotion and would not come to work. Times was informed of the demotion on October 9. At no point did he advise Success Academy that he would accept his new title and role. As he acknowledged in his complaint, he "refused to accept Defendants' discriminatory and retaliatory demotion." In his deposition, he testified that as of November 17 he was "not sure" whether he was prepared to return to work at his "re-leveled position" and only went into Success Academy on November 17th for a scheduled meeting. Accordingly, there is no dispute that over the course of five weeks, Times refused to accept his demotion.

To raise an inference of discrimination, Times points again to Morales as a comparator and relies on a statement that Haley made on November 17. Neither raises a question of fact

26

regarding his employer's motivation in terminating his
employment.

Times first argues that the difference in the way Success
Academy responded to Morales' illness and his own illness
provides evidence that the termination of his employment was
discriminatory.  Morales, the purported comparator, was absent
for eleven days in 2020 while ill with COVID-19 but was not
fired or instructed on how to apply for a leave of absence.
This is inapposite.  Morales is not a comparator with respect to
the termination of Times's employment.  Morales was not demoted
and therefore did not have to communicate whether he would
accept the demotion.

Finally, Times asserts that Haley told him during their
meeting on November 17 that he was not a "cultural fit" with
Success Academy.  The defendants contend that this a neutral
statement.  It is.  The only evidence to which Times points,
which could transform this racially neutral statement into a
statement reflecting discriminatory intent, is the evidence that
will be discussed next.

D. General Evidence

To support each of his allegations of discrimination, Times
argues that Success Academy and the three individual defendants
treated African American teachers, guest speakers and students

27

unfairly in certain respects.  He argues, in essence, that this unfair treatment of others suffices to show that his treatment was discriminatory.

For Times to succeed on his claim of discrimination, however, he must show that Success Academy took an adverse action against him because of his race.  Chin v. Port Auth. Of N.Y. and N.J., 685 F.3d 135, 147 (2d Cir. 2012).  Private plaintiffs are not permitted to use pattern-or-practice proof outside the class action context.  Id. at 149.  Nonetheless, "[e]vidence of an employer's general practice of discrimination may be highly relevant" to a disparate treatment claim.  Id. at 150.

Here, none of the treatment of others to which Times points is sufficiently tethered to his own circumstances to be of assistance to him.  Without evidence to show that a particular adverse action taken against him was at least partially motivated by racial discrimination against him, Times's claims of discrimination fail.  Times's accusations of bias in essentially five circumstances will nonetheless be discussed. The five circumstances concern the basketball program, the treatment generally of Black employees, the use of an all-white selection committee to decide chess teacher promotions, a

stringent background check for a Black guest instructor, and the
location of chess competitions.

###### 1.   Basketball Furloughs

Times argues that in April of 2020, as New York City
entered the COVID-19 pandemic, Success Academy placed more
basketball coaches on furlough than soccer coaches.  Times
asserts that many basketball coaches are Black and many soccer
coaches are white.  Times claims that the term "cultural fit"
was used to justify or explain this decision.  From this chain
of events, Times argues that Success Academy uses the term
"cultural fit" in connection with race-based decisions to mask
discriminatory intent.

Times has offered no admissible evidence to support this
argument.  He does not identify the individual who made the
furlough decisions or who used the term "cultural fit."  He has
a chart regarding basketball coaches prepared with the help of a
former basketball manager, but there is no affidavit from that
manager and thus the chart is inadmissible.  Times does not
offer any description of the number of soccer coaches, their
races, or their employment status.  Without admissible evidence
to support his theory, it is unnecessary to discuss the reasons
that Success Academy has given for treating different sports
programs differently during the pandemic.

29

            2.   Black Chess Teachers

     Times next asserts that Success Academy failed to promote
Black chess teachers, citing two examples.  Neither example
supports the inference Times seeks to draw.

     To begin with, the parties have presented evidence that
Success Academy in fact hired and promoted Black chess teachers
during the 2018-2019 and 2019-2020 school years.  Of course,
Times himself was hired in 2019 to oversee Success Academy's
entire chess program, including its personnel decisions.  That
same year, another Black employee, Chris Johnson, was promoted
even through Times recommended a white employee, Robert Leonard,
for the position.

     As his first example of alleged discrimination, Times
argues that Tyrell Harriott, a Black chess teacher, should have
been given a Labsite role[4] in the fall of 2019.  For several
reasons, the relevant facts provide no basis to infer race
discrimination.  Labsite appointments are one-year appointments.
In the fall of 2019, three other Black chess teachers were
promoted to the three Labsite positions.[5]  In any event,

---

[4] Labsite Teachers, or Labsite Leads, are model teachers who have
responsibilities to train other teachers and assist with
curriculum development.

[5] Times and the defendants appear to disagree about the race of
one of the Labsite teachers.  Times describes one of the 2019-
2020 Labsite teachers, Alexander Beltre, as Black and Afro-

Harriott was only a part-time teacher, Times had not recommended Harriott for the role, and Times indicated to a human resources representative that the teachers chosen for Labsite were "well chosen."

As his second example, Times points to the appointment of a white chess teacher to the Labsite role in the spring of 2020 instead of a Black chess teacher.  In the spring of 2020, Success Academy reduced the number of Labsites from three to one and appointed a white teacher to the position.  Times wrote four letters of recommendation: for two Black chess teachers, for one Hispanic chess teacher, and for the white chess teacher who received the appointment.  Times does not contend that the reduction in the number of Labsite roles was discriminatory or that the white chess teacher was less qualified for the position than the others he recommended.  These facts do not support an inference of discrimination.

Finally, Times argues, without offering evidence, that the performance evaluations for Black and Brown chess teachers were biased and based on subjective "cultural fit" criteria.  It was Times and Morales who performed these evaluations.  When Times ranked the Academy's chess instructors, Times gave his highest

---

Latino, while the defendants describe Beltre as Latino.  This disagreement is not material.

rankings to a Caucasian and a Latino teacher and his lowest

ratings to three Black teachers.[6]  To the extent Times takes

issue with the criteria he used to evaluate the chess teachers,

he provides no evidence that the criteria were discriminatory.

      3.    Selection Committee

In a related argument, Times asserts that an "all white"

selection committee selected Labsite and Content Leads.  There

were three levels of decision-makers in this selection process.

Senior Leaders made recommendations to the SL Committee, which

in turn made recommendations to a committee of Final Deciders.

Times asserts that three out of five members of the SL committee

where white and that the other two members did not participate

in the evaluation.  Times does not describe the races of the

Senior Leaders or the members of the Final Deciders except for

Haley, who is Asian.  As previously discussed, Times has not

established that the promotion decisions made through the

selection process were discriminatory.  Of the four Labsite

appointments to which Times refers, Times describes three of the

four as Black, and the white teacher who was appointed in 2020

was among those recommended by Times.  The racial composition of

_____

[6] The defendants provided a list of the teachers evaluated by
Times and Morales, their races, and their evaluation scores.
Times does not dispute the authenticity of this list, but argues
that associated metadata was not provided.

the SL Committee is not, by itself, sufficient to raise an
inference of discrimination in the selection process.

### 4.    Background Check

Times points to evidence that a Black guest instructor was
subjected to a more stringent background check, which included
fingerprinting, than two white guest speakers.  As Success
Academy explains, however, the level of background checks is
driven by whether the guest will be working directly with
children as opposed to speaking only to teachers.  Times has
offered no evidence to contradict this evidence or to support an
inference of discrimination.

### 5.    Relocation of Tournaments

Finally, Times points to a decision made before he arrived
at Success Academy to relocate chess tournaments to locations in
the Upper West Side and Cobble Hill from neighborhoods with a
larger percentage of minority populations.  Success Academy
states that the tournaments were relocated to schools that had
more space for the necessary equipment and that were more easily
accessible to all students traveling by mass transit.  Times has
not offered evidence to the contrary.

## B. NYSHRL and NYCHRL

Times has brought the same claims of employment
discrimination under the NYCHRL and NYSHRL.  The claims brought

33

under these two statutes are analyzed using the framework used for Title VII claims.  Lenzi v. Systemax, Inc., 944 F.3d 97, 107 n.7 (2d Cir. 2019) (citation omitted) (NYSHRL); Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) (citation omitted) (NYCHRL).

Claims brought under the NYCHRL, however, "must be reviewed independently from and more liberally than their federal" counterpart.  Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted).  The NYCHRL does not require that a plaintiff prove a materially adverse employment action.  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 114 (2d Cir. 2013) (citation omitted).  Rather, "the plaintiff need only show differential treatment -- that she is treated 'less well' -- because of a discriminatory intent."  Id. at 110 (citation omitted).  Nonetheless, "district courts must be mindful that the NYCHRL is not a general civility code."  Id. (citation omitted).  Accordingly, the plaintiff "still bears the burden of showing that the conduct is caused by a discriminatory motive."  Id.

The NYSHRL was amended, effective August 12, 2019.  See 2019 N.Y. Sess. Laws ch. 160.  As amended, the NYSHRL must be "construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights

34

laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed."  N.Y. Exec. Law. § 300 (2023).  The standard of liability under the NYSHRL will thus be treated as akin to the standard under the NYCHRL.

Even though employment discrimination claims brought under the NYSHRL and the NYCHRL must be evaluated more generously and flexibly, Times's claims do not survive.  He has failed to offer evidence to support an inference that his performance reviews, his demotion, or the termination of his employment were motivated by race discrimination.

C. Section 1983

Times also brings claims under § 1983 against the individual defendants.[7]  "A § 1983 plaintiff must establish that a person acting under the color of state law deprived him of a right guaranteed by the Constitution or the laws of the United States."  Vincent v. Annucci, 63 F.4th 145, 151 (2d Cir. 2023) (citation omitted).  The plaintiff "must show that the discrimination was intentional."  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004).  "Personal involvement of defendants in alleged constitutional deprivations is a

---

[7] The defendants do not dispute that Success Academy is subject to § 1983.

prerequisite to an award of damages under § 1983." <u>Baltas v. Maiga</u>, 119 F.4th 255, 269 (2d Cir. 2024) (citation omitted).

Section 1983 claims for discrimination are evaluated using the same <u>McDonnell Douglas</u> burden-shifting framework as Title VII claims. <u>Naumovski v. Norris</u>, 934 F.3d 200, 214 (2d Cir. 2019). Furthermore, discriminatory intent must be a "but-for" cause of the adverse employment action; it is insufficient to establish that discrimination was only a motivating factor. <u>Id.</u> Because Times has failed to offer evidence to support an inference that his performance reviews, his demotion, or the termination of his employment were motivated by race discrimination, his claims under § 1983 must also be dismissed.

## II. Retaliation

Times next brings claims for retaliation under Title VII and the NYSHRL. The federal and state law claims shall be addressed separately.

### A. Title VII

Title VII "prohibits an employer from discriminating against an employee because the employee has engaged in protected activity." <u>Banks v. General Motors, LLC</u>, 81 F.4th 242, 275 (2d Cir. 2023). To establish a <u>prima facie</u> claim for retaliation, a plaintiff must show that

> (1) [He] engaged in protected activity, (2) the
> defendant was aware of that activity, (3) [he] was
> subjected to a retaliatory action, or a series of
> retaliatory actions, that were materially adverse, and
> (4) there was a causal connection between the
> protected activity and the materially adverse action
> or actions.

Carr v. New York City Transit Authority, 76 F.4th 172, 180 (2d Cir. 2023).

Protected activity includes "opposing an unlawful employment practice" or otherwise "participating in any manner in an investigation, proceeding, or hearing." Banks, 81 F.4th at 275 (citing Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)). "[A]ny activity designed to resist or antagonize; to contend against; to confront; resist; or withstand discrimination" constitutes a "protected oppositional activity." Littlejohn v. City of New York, 795 F.3d 297, 317 (citing Crawford v. Metropolitan Gov't, 555 U.S. 271, 276 (2009)). "[W]hen an employee communicates to [his] employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to that activity." Id. (citation omitted) (emphasis in original). An employee's complaint may qualify as protected activity so long as the employee had "a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII."

37

Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.,
716 F.3d 10, 14 (2d Cir. 2013) (citation omitted).  As to the
second element, "implicit in the requirement that the employer
have been aware of the protected activity is the requirement
that it understood, or could reasonably have understood, that
the plaintiff's opposition was directed at conduct prohibited by
Title VII."  Id. at 15 (citation omitted).

An action qualifies as "materially adverse" under Title VII
if it is "harmful to the point that it could well dissuade a
reasonable worker from making or supporting a charge of
discrimination."  Moll, 94 F.4th at 239 (citing Burlington
Northern, 548 U.S. at 57) (emphasis omitted).  "This standard is
plainly an objective one," but "an act that would be immaterial
in some situations is material in others" depending on the
circumstances.  Id. (citation omitted).

A causal relationship between the protected activity and
the adverse action "can be established either (1) directly,
through evidence of retaliatory animus toward the plaintiff, or
(2) indirectly, through circumstantial evidence."  Id. (citation
omitted).  Such circumstantial evidence may include "close
temporal proximity between the plaintiff's protected activity
and the adverse action."  Id. (citation omitted).  Nevertheless,
temporal proximity, "without more," is "insufficient to satisfy

38

[plaintiff]'s burden to bring forward some evidence of pretext." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. V. Nassar, 570 U.S. 338 (2013).  See Bentley v. AutoZoners, LLC, 935 F.3d 76, 90 (2d Cir. 2019).

Retaliation claims brought under Title VII are also analyzed using the McDonnell Douglas burden-shifting test. Carr, 76 F.4th at 178.  If a plaintiff can demonstrate a prima facie case of retaliation under this test, a defendant may rebut this showing "by providing a legitimate, non-retaliatory reason for the allegedly retaliatory action."  Id.  If the defendant provides this reason, "the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action."  Id. (citation omitted).  There can be more than one but-for cause of an employment action.  Banks, 81 F.4th at 275 (citing Bostock v. Clayton Cnty., G.A., 590 U.S. 644, 656 (2020)).

The plaintiff asserts that he engaged in protected activity on essentially six occasions.  Four of these concern Times' involvement in complaints made by former Success Academy employee Tyrell Harriott and they will be addressed first.

i. Harriott

The events concerning Harriott on which Times relies to support his claims of retaliation unfolded between October of 2019 and August of 2020.  On October 20, 2019, Harriott complained to Success Academy's Human Resources department that Morales had engaged in "discrimination, bullying, and harassment" against him.  Harriott copied Times on his complaint.  Harriott noted in the complaint that Times had recommended that Harriott escalate his complaint to Human Resources.  Times forwarded this complaint to Haley and stated, "Here is Tyrell [Harriott]'s complaint about Matthew regarding bullying and harassment.  There are other incidents I need to address with you regarding Matt [Morales]'s bullying behavior that have been detrimental to our program.[8]  For now I'll leave you with Tyrell's synopsis."

On October 21 and 24, Natalie Allen, a human resources representative, interviewed Times about Harriott's complaint.  During the interview on October 24, Times explained that Harriott felt he was wrongfully denied the opportunity to apply for the Labsite and Content Lead positions.  Times also described an incident in which Harriott challenged Morales;

---

[8] Times has not offered evidence of "other incidents" that he described to Haley.

Case 1:23-cv-03229-DLC    Document 82    Filed 12/06/24    Page 41 of 53

Times said that he had agreed with Harriott.[9]  When Allen asked if other people had raised concerns about Morales, Times noted that there were concerns about "the picture being taken."  This refers to an incident in which a white chess teacher, Gregory Keener, had, without permission, taken a picture of Giovanni Merritt, a Black chess teacher, and emailed the photo to Morales.  The photograph made it appear that Merritt was sleeping at work.  Times also stated that there were concerns about Morales's "nepotism."  Without reciting the precise words he used, Times asserts that he "advocated against discriminatory practices associated with the unauthorized photo" and supported Harriott's promotion to Labsite Lead.

On June 12, 2020, Harriott filed an inquiry with the EEOC, asserting that he had been retaliated against by Success Academy and forced to transfer to another of its schools.  The inquiry form listed Times as a person who would support his claim.  The defendants were unaware of Harriott's June inquiry to the EEOC.

Harriott's employment at Success Academy was terminated on June 19, 2020.  A parent sent an email describing the termination as an injustice.  On June 30, Times emailed Haley:

> We have to be careful regarding this matter.  It is a possibility Tyrell Harriot might file a wrongful termination lawsuit.  Any response to a parent on our part could become public.

---

[9] The record does not further describe the incident.

41

Tyrell's performance metrics were outstanding.  He had
two scholars that won the Feinberg award.  In 2019,
Bedstuy middle school won the end of the year
tournament.  Also, in 2019, he had the highest-rated
scholar in the Network, [redacted].  In school year
SY20-21 his girls' teams won divisions in the All-
Girls city and state championships.  From the
viewpoint of the Bedstuy community, they are losing a
coach that had a significant impact on their
children's lives.

The parents have rejected the argument that his
transfer was for the good of the network.  They feel
that Tyrell's commitment to their scholars was for the
good of the network.  What the parents want is for
Tyrell to be reinstated.

It must be mentioned here that the chess director was
not involved in the process of transferring this
teacher.  It was only after the transfer was taking
ground that I asked for additional locations for the
teacher to be placed.  Going forward I hope that we
are more thoughtful in our decision-making regarding
teacher placement.

This requires further discussion.

On August 25, 2020, Harriott filed a Charge of

Discrimination with the EEOC.  The charge alleged that Morales

had discriminated against him, that he was transferred as

retaliation for filing a complaint, and that his employment was

terminated after he refused the transfer.  The Charge of

Discrimination did not mention Times.  In due course, Success

Academy received a copy of this Charge.

Times argues that four of these events qualify as protected

activity.  They are his support of Harriott in October 2019; his

support of Merritt in October 2019; Harriott listing Times as a
potential witness in Harriott's June 12, 2020 EEOC inquiry; and
Times's opposition to the termination of Harriott's employment
in June 2020.  Times argues that the following occurred because
of that protected activity: his negative June 2020 performance
review, the August 2020 development plan, a disciplinary meeting
with DeJongh in approximately August 2020,[10] his demotion in
October 2020, and the termination of his employment in November
2020.

Times has failed to raise a question of fact that his
activities on behalf of Harriott and Merritt in October 2019 are
causally related to the events which he identifies as
retaliatory.  The events he describes as retaliatory began in
June 2020, with his performance review that month.  This is a
gap of eight months.  While there is no bright line beyond which
a temporal proximity is too remote to establish a causal
relationship, Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir.
2013), eight months is too long to permit a showing of causation
through temporal proximity alone.  Clark Cnty. Sch. Dist. v.
Breeden, 532 U.S. 268, 273-74 (2001).  Here, Times has failed to
point to other evidence to support an inference of causation.

---

[10] Times does not give a date for the meeting with DeJongh, but
lists it as occurring after the August 2020 development plan and
before the October 2020 demotion.

43

Tellingly, in the interim, he had received a January 2020 performance review that recited deficiencies in his performance and several of his director-level duties had been reallocated to reduce the demands of his position.  He does not identify either of those occurrences as reflecting retaliatory treatment for his support of his two subordinates the prior October.  Accordingly, summary judgment is entered for the defendants on the retaliation claim based on the October 2019 activity.

Harriott's June 2020 EEOC Inquiry does not constitute protected activity.  That Inquiry listed Times as a witness, but Success Academy was not given notice of the Inquiry and without such notice it cannot support a retaliation claim.

This leaves Times's June 30, 2020 email as the last instance of protected activity to be discussed here.  Times has not shown that his statements in that email qualify as protected activity or that they would have been perceived as such by Haley.  Times's email did not oppose the termination of Harriott's employment, much less describe it as discriminatory. At most, Times warned Success Academy that it had to be careful in responding to the parent's letter and asked that he be involved in future transfer decisions.

ii. Demotion

Times next asserts that his employment was terminated in retaliation for two emails he sent to protest his demotion.  In an October 16, 2020 email to Moskowitz, Times listed his many accomplishments as a Director of Chess and asked to continue with full management of the chess team and permission to build his own team.  In an October 22 email to Human Resources, he complained that his demotion as part of the re-levelling project had to be "part of a larger discussion about unconscious bias" in the organization.

The defendants are granted summary judgment on the retaliation claim to the extent it asserts that the October 16 email was protected activity.  It was not.  Activity is only protected under Title VII if the employer "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  Kelly, 716 F.3d at 14-15.

The retaliation claim premised on the October 22 email requires further discussion.  The defendants argue that Times's reference to unconscious bias is not protected activity because he made no mention of race or discrimination in that email.  Not so.  Times's reference to unconscious bias may be understood as communicating a belief that his employer had engaged in a

45

discriminatory practice as well as stating opposition to that practice.

The defendants further argue that the termination of Times's employment was not causally related to his October 22 email.  Times was fired within weeks of the October 22 email. The temporal proximity between the October 22 email and the termination of Times's employment may be sufficient to support an inference of retaliation.  See Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 555 (2d Cir. 2001).

The defendants have offered evidence that Times was fired for his refusal to accept his demotion.  This evidence, however, is insufficient to support a conclusion as a matter of law that the October 22 email was not a but-for cause of that firing.  It does not appear that the defendants had decided to fire Times before October 22, when he sent an email referring to unconscious bias, and it is a question of fact whether the defendants would have fired Times even if he had not sent the October 22 email.

    b. NYSHRL

The framework for evaluating a retaliation claim is the same under Title VII and the NYSHRL.  Kelly, 716 F.3d at 14. Amendments to the NYSHRL require that courts construe that

46

statute "liberally for the accomplishment of [its] remedial purposes." N.Y. Exec. Law. § 300 (2023). Individuals can be held liable under the NYSHRL as aiders and abettors when they "actually participate[d] in the conduct giving rise to a discrimination claim." Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

As discussed above, Times has adduced evidence to create a question of fact as to whether his October 22 email opposing his demotion was causally related to the termination of his employment. He has not shown that any retaliatory conduct occurred "as a result of" his support for Harriott and Merritt in October of 2019. Nor has he shown that his June 30 and October 16, 2020 emails were actions opposing his employer's discrimination. Summary judgment is therefore granted to the defendants on all retaliation claims under the NYSHRL except for the plaintiff's claim arising out of the October 22, 2020 email. The claim must be dismissed against Morales, however, because Times has not shown that Morales personally participated in the decision to terminate of his employment.

III. Hostile Work Environment

Times also brings a claim under Title VII that he was subjected to a hostile work environment.  He brings a parallel claim under the NYSHRL.

A. Title VII

To prove a hostile work environment claim under Title VII, the plaintiff must establish that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive enough to alter the conditions of the victim's employment and create an abusive working environment."  Moll, 94 F.4th at 228 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  The plaintiff must establish both the objective and subjective elements of the claim.  Id. at 229.  The misconduct must have been "severe or pervasive enough to create an objectively hostile or abusive work environment," that is, "an environment that a reasonable person would find hostile or abusive."  Id. (citing Harris, 510 U.S. at 21).  The plaintiff must have also "subjectively perceived the environment to be abusive."  Id. (citing Harris, 510 U.S. at 21).  Whether a particular environment is objectively hostile or abusive "can be determined only by looking at all the circumstances," which may include but are not limited to "the frequency of the discriminatory conduct; its

48

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citing Harris, 510 U.S. at 23.)  No single factor is required.  Id. There is "neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." Id. (citation omitted).

"The hostility of the work environment as a whole, not the motivation of one decisionmaker, is the central inquiry in a hostile work environment claim." Banks, 81 F.4th at 262 (citation omitted).  Thus, "conduct not directly targeted at or spoken to an individual but purposefully taking place in [his] presence can nevertheless transform [his] work environment into a hostile or abusive one." Id. (citation omitted).

Neither Times nor the defendants emphasize the hostile work environment claim in their submissions.  Times's hostile work environment claim appears to rest principally on the following: the failure to promote Harriott in the spring of 2019, Merritt's photograph being sent to Morales in the spring of 2019, Harriott's firing in June 2020, Times's October 2020 demotion, and the November 2020 termination of Times's employment.  Times

49

also mentions generally that Black chess instructors were not promoted as they should have been and were not fairly evaluated. He adds that Eric Harrield, a former basketball manager, experienced racial discrimination and retaliation. Harrield's employment was terminated in 2020 and Times asserts that Harrield was told he was not a "cultural fit."[11]  Finally, Times relies on an affidavit of Jemina Watstein, who worked at Success Academy as a Visual Arts manager from February of 2019 through August of 2020. Watstein stated that she witnessed Haley shout on one occasion at Times and a colleague who was a person of color. Watstein does not report what Haley said or what occasioned the shouting. Times does not describe the incident himself.

Times has not offered sufficient evidence to permit a jury to find that a hostile work environment existed. As already described, at the time Harriott was not promoted, Times indicated that those promoted were "well chosen". One subordinate sending a photograph to another subordinate did not create a hostile work environment for Times. Times did not protest the decision to fire Harriott; instead he asked to be involved in future transfer decisions. Times's demotion and firing occurred at the end of his employment and were disparate

---

[11] Times has not provided admissible evidence of this statement.

acts.  Times has not provided sufficient evidence about the
evaluation and promotion of chess teachers to support an
inference that there was discrimination in those processes.
Indeed, as already described, Times was one of two evaluators of
all the chess teachers and ranked some of the Black chess
teachers as the weakest.  Finally, the one instance of shouting
described by Watstein (but not Times) was not sufficiently
severe to create a hostile work environment.

    B.  NYSRHL

    Hostile work environment claims brought under the NYSHRL
must be "construed liberally."  N.Y. Exec. Law. § 300.  Even
under this lenient standard, Times has not offered evidence that
would allow a jury to find that a hostile work environment
existed.  Summary judgment is therefore granted as to his claim
for a hostile work environment under the NYSHRL.

    IV.  Discovery Requests

    Times requests an opportunity to take additional document
discovery from the defendants.  He argues that the defendants
"obstructed" electronic discovery during this litigation and
that this is evidence of their retaliatory animus against him.
This argument fails.

    This litigation was filed on April 18, 2023.  At that time,
Times was represented by counsel.  At a conference with the

Court on November 3, the parties jointly proposed that fact discovery conclude on February 29.  A scheduling order essentially adopted their proposal and required discovery to be completed by March 1, 2024.  Plaintiff made 64 separate requests for the production of documents.  The defendants responded to each of them, although at times they indicated that they had no responsive documents.  At the parties' request, the date for the conclusion of discovery was extended to April 19.  During the discovery period, plaintiff's counsel did not raise any discovery disputes with the Court.

Times' counsel sought to withdraw on April 2, describing an irretrievable breakdown in the attorney-client relationship. Times did not oppose the withdrawal and has opposed the motion for summary judgment pro se.  As part of that opposition, Times has made 199 requests for additional documents.  These requests are not targeted and would essentially require that discovery begin anew.  This would not be fair to the defendants or appropriate.  Accordingly, the request to reopen discovery is denied.

## Conclusion

The defendants' May 28, 2024 motion for summary judgment is granted in part.  Matthew Morales is granted summary judgment on

52

all claims brought against him.  The defendants are granted
summary judgment on the plaintiff's claims for discrimination
under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §
2000e et seq., the New York State Human Rights Law, N.Y. Exec.
Law. § 290 et seq., 42 U.S.C. § 1983, and the New York City
Admin Code § 8-101 et seq., and on the plaintiff's claims for a
hostile work environment under Title VII and the New York State
Human Rights Law.  The defendants are granted summary judgment
on the plaintiff's claims for retaliation under Title VII and
the New York State Human Rights Law with the following
exception: the retaliation claims premised on Times's October
22, 2020 email and the termination of Times's employment
survive.


Dated:     New York, New York
           December 6, 2024


                                    _____
                                        DENISE COTE
                              United States District Judge